Filed 6/22/22

<u>**CERTIFIED FOR PARTIAL PUBLICATION**</u>\*

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>JUAN ALEJANDRO MONTANO et al.,<br><br>    Defendants and Appellants. | F079222<br><br>(Super. Ct. Nos. BF169286A–C)<br><br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Kern County.  Charles R. Brehmer, Judge.

Sylvia W. Beckham, under appointment by the Court of Appeal, for Defendant and Appellant Juan Alejandro Montano.

Solomon Wollack, under appointment by the Court of Appeal, for Defendant and Appellant Jose Antonio Montano.

Paul Couenhoven, under appointment by the Court of Appeal, for Defendant and Appellant Giovanni Thomas Jasso.

---

\*Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts I., II.E., and III. through VI.

Xavier Becerra and Rob Bonta, Attorneys General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Julie Hokans and Henry J. Valle, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

Juan Alejandro Montano (Juan), his brother, Jose Antonio Montano (Jose), and Giovanni Thomas Jasso (Jasso) (collectively, defendants) appeal from judgments of conviction entered upon jury verdicts of first degree murder with the special circumstance of lying in wait, and unlawful participation in a criminal street gang. Juan was also found guilty of gun possession by a convicted felon. The jury made true findings on various firearm- and gang-enhancement allegations. It hung on a special circumstance allegation of gang murder within the meaning of Penal Code section 190.2, subdivision (a)(22) (section 190.2(a)(22)). (All undesignated statutory references are to the Penal Code.)

In the published part of the opinion, we hold Assembly Bill No. 333 (2021–2022 Reg. Sess.) (Assembly Bill 333), which amended section 186.22 and added a new statute, section 1109, is fully retroactive to all nonfinal judgments. We further hold section 1109, as currently written, does not apply to gang special circumstance allegations under section 190.2(a)(22). Section 1109, subdivision (a) provides for bifurcation of gang enhancement allegations "charged under subdivision (b) or (d) of Section 186.22." Section 1109, subdivision (b) requires a charge of violating subdivision (a) of section 186.22, i.e., the substantive gang offense, to be "tried separately from all other counts that do not otherwise require gang evidence as an element of the crime." (§ 1109, subd. (b).) Although failure to account for section 190.2(a)(22) may have been an oversight by the drafters of section 1109, it is not our place to rewrite the statute. Such changes must come from the Legislature.

In the unpublished part of the opinion, we address defendants' claims of insufficient evidence, improper admission of evidence, instructional error, and sentencing error. We affirm in part, reverse in part, and remand for further proceedings.

2.

## FACTUAL AND PROCEDURAL BACKGROUND

On July 21, 2017, victim Abraham Rubio (age 17) was shot while walking on Paradise Road in Lamont. The shooting occurred in front of a house rented by defendant Jose, his girlfriend, and the girlfriend's mother. Jose's girlfriend called 911 after hearing the gunshots and seeing the wounded victim in distress.

A sheriff's deputy arrived soon after the emergency dispatch. Rubio was able to provide his name and age but declined to answer questions about the shooting. He died from internal injuries later that evening. A postmortem toxicology analysis indicated prior consumption of alcohol, marijuana, and methamphetamine.

The deputy had found Rubio in the street lying on his back in between a Ford Bronco and a Lincoln pickup truck. The vehicles were parallel parked along the southern curb of Paradise Road, facing east. The Bronco was parked west of the driveway to Jose's residence, and the Lincoln was parked a few feet behind the Bronco. Four 9-millimeter bullet casings were located northeast of the Bronco, within approximately eight feet of where Rubio had fallen after being shot. Three of the casings were of the same brand, but the fourth was made by a different manufacturer.

Rubio sustained two bullet wounds to the right abdominal area. A third bullet hit his left thigh, close to the knee. The fourth shot apparently missed him. Investigators found a bullet lodged above the front driver's side bumper of the Lincoln truck, close to where Rubio had collapsed.

The events were captured on video by a security camera located outside of a nearby restaurant. The video showed that four people had either witnessed or participated in the shooting. After reviewing hours of footage and conducting further investigation, detectives obtained arrest warrants for Juan (age 22), Jose (age 21), and Jasso (age 19). Search warrants were obtained for defendants' Facebook accounts and "to ping the realtime location" of a phone associated with Juan. Authorities did not seek

3.

to arrest the fourth suspect, Kasey Villegas, who was later stabbed to death in an unrelated incident.

On July 27, 2017, a relative turned Rubio's mobile phone over to law enforcement. It was covered in dried blood. The person did not explain how the item was obtained but alleged it had "passed through several different hands." The name of a local gang, "Varrio Chico Lamont," was etched into the back of the device.

On August 4, 2017, Jasso was taken into custody during a traffic stop. He waived the right to remain silent and briefly answered questions about the shooting. Jasso stated that he lived in Bakersfield. He denied knowing anyone in Lamont or being there on the day of the incident.

On August 5, 2017, Jose was arrested at his home. He waived the right to remain silent and submitted to a lengthy interrogation. Jose's girlfriend voluntarily accompanied him to the Kern County Sheriff's Office and, while there, she agreed to answer questions about the shooting. Both interviews were recorded.

Jose told detectives that the victim, Rubio, had previously lived in the house he had rented on Paradise Road. Rubio was also a longtime friend of Jose's girlfriend. The details were vague, but Jose alleged Rubio had shown up at his residence under the influence of narcotics on the day in question. Rubio had wanted to discuss drug dealing, and Jose told him that he did not want any drug trafficking near the house. Jose had been polite, but Rubio was upset by the conversation.

Rubio departed from Jose's residence but confronted him again "like, three more times" that day. The second encounter was outside of a liquor store. Rubio still appeared to be "on drugs," and Jose claimed to have "smelled alcohol on his breath." Rubio challenged Jose to a fistfight, but Jose declined. He had been concerned about Rubio's friends, explaining to detectives that "some of his buddies that he knows that he grew up with, they were right there around him." Jose further claimed to have told Rubio, "[I]f I

4.

even touch you, I know you're gonna go tell your friends. And your friends are gonna come try to beat me up." Jose said this incident occurred around 5:00 p.m.

Jose did not recount any further interactions with Rubio prior to the shooting. He claimed to have been asleep when the shots were fired, which was shortly after 8:00 p.m. In Jose's initial story, the sound of gunfire woke him from a nap. He then went outside to investigate and render aid. Jose denied having had any other visitors that day except for his girlfriend's father and someone who came over to see his girlfriend's mother.

A detective asked Jose, "Why are people on the streets sayin' that you and [Rubio] were fightin' over some tagging?" He replied, "Exactly. That was the whole reason." He then explained Rubio had been upset about some graffiti on an abandoned house previously occupied by Rubio's grandmother. Jose alleged the graffiti was placed there five years earlier by one of his friends, but it included Jose's nickname ("Toker"), so Rubio had assumed Jose was involved.

Jose admitted the "tagging" of Rubio's grandmother's house included references to a Bakersfield gang called Varrio Bakers. Jose had previously lived in Bakersfield, but he denied being a gang member and downplayed the significance of a gang-related tattoo on his hand. When pressed about the gang angle, Jose said the dispute with Rubio was *not* about the graffiti and only concerned Rubio's drug use and drug dealing. The detectives then confronted Jose with still images from the surveillance video.

When Jose was shown images of his brother (Juan), Jasso, and Kasey Villegas, he denied knowing any of them. He stuck to the story about being inside the house when Rubio was shot. Amid repeated denials, Jose remarked, "I could've died too." A detective then asked, "Why, did [Rubio] have a gun?" Jose answered, "I don't know if he had a gun[,] [but] I could've got shot that day he was calling me out." Jose was then asked, "Did he pull a gun on you?" He replied, "No."

Jose eventually admitted to being in his front yard when the shooting occurred but denied seeing who fired the shots. Conceding his prior dishonesty, he said, "I'm sorry

5.

that I did fall off the train a little bit. … But at the same time it's 'cause I have four beautiful kids. … I didn't want anything to happen to me, to my kids, or, like, to Rubio, or to my family. … I know I left some parts out about what [Rubio] said. But, like I said, I ain't a bitch or a—a snitch or whatever it is. … I just don't want, like, you guys think that I'm the one that did it." When asked again if Rubio was armed, Jose continued to deny having seen anything. He later made a comment about knowing "my brother's buddies did it," implying he came to that realization after being shown the surveillance images.

Jose's girlfriend corroborated parts of his story but also contradicted him on important details. She claimed to have witnessed Rubio's initial argument with Jose over the "tagging" of his grandmother's house. Rubio had wanted to "go to the alley and [fight]," referring to an alley intersecting Paradise Road between the restaurant and the home of Jose's neighbor, i.e., the house adjacent to the Ford Bronco and the Lincoln pickup truck.

The girlfriend discussed how Jose went to the liquor store and returned alleging Rubio had confronted him again, this time with "all his homies." She also referred to Rubio's friends as "gangsters from Lamont." Whereas Jose had generally characterized the dispute as a minor "misunderstanding," the girlfriend alleged Rubio had threated to obtain a firearm and kill Jose. Rubio was supposedly living with her uncle at the time, and she believed her uncle would have let Rubio borrow his gun. Her exact statement was, "Jose has told me, well, Jose, if it wasn't [Rubio], it would have been Jose, cuz (unintelligible) if you guys would have heard what he was saying to Jose about him killing him too or shooting him and I know my [uncle] has a gun and he would have lended [sic] it to him."

Jose's girlfriend identified Jasso and Juan from the surveillance images. She confirmed they had visited Jose that evening, which she admitted was "weird" because Juan, who lived in Bakersfield, rarely travelled to Lamont. She had suspected the visit

had something to do with Rubio and claimed to have warned Juan, "[Y]ou better not do nothing stupid." She further alleged Jose later confided to her that Juan was the shooter.[1]

Juan was arrested on the same day as Jose. It is unclear from the record whether he submitted to custodial interrogation.

On September 5, 2017, detectives recontacted Jose's girlfriend and arranged to speak with her younger sister, who was a juvenile. Jose's girlfriend had previously identified her sister as an eyewitness to the shooting. The sister denied this and claimed she was inside with Jose when the shots were fired. However, the sister admitted to having let Jose use her mobile phone earlier that day. The detectives photographed her call log, which showed calls to and from Juan's phone between 5:10 p.m. and 6:32 p.m. The sister denied placing those calls herself or recognizing the phone number.

In January 2018, while speaking with a sheriff's deputy, the sister reportedly claimed to have seen Juan shoot Rubio. According to the deputy, the sister admitted to being untruthful with the homicide detectives and alleged unspecified family members "had told her to lie to try to protect Juan." The sister allegedly believed Juan shot Rubio because Rubio "had kicked in his door and robbed him and … had committed crimes against him in the past." In the prior interview with detectives, she claimed to have heard Jose say he feared Rubio because Rubio "said he was gonna get a gun to shoot him."

Defendants were each charged with first degree murder (§§ 187, 189; count 1) and unlawful participation in a criminal street gang (§ 186.22, subd. (a); count 2). Juan was additionally charged with possession of a firearm by a convicted felon (§ 29800, subd. (a)(1); count 3). Count 1 included special circumstance allegations of lying in wait

---

[1]Jose's alleged identification of Juan as the shooter was redacted from the recording used at trial. Part of the redacted material was potentially exculpatory as to Jose and Jasso. According to the girlfriend, Jose had told her, "I believe it was my brother but I don't know. He just popped, it happened so quick and I told him not to …." Jasso's attorney objected to the redaction but was overruled. The redacted version makes clear Jose's girlfriend believed Juan was the shooter but omits the explanations as to why.

(§ 190.2, subd. (a)(15)) and murder committed to further the activities of a criminal street gang (*id*., subd. (a)(22)). Firearm and gang enhancement allegations were also included. (§§ 186.22, subd. (b), 12022.53, subds. (d), (e)(1).)

As to Juan only, two prior convictions were alleged for purposes of the "Three Strikes" law. (§§ 667, subds. (b)–(i), 1170.12.) The strike offenses of second degree robbery and unlawful participation in a criminal street gang were alleged to also qualify as prior serious felony convictions under section 667, subdivision (a). Juan was further alleged to have served two prior prison terms within the meaning of section 667.5, former subdivision (b).

Defendants were jointly tried before a jury in early 2019. The prior conviction allegations against Juan were decided in a subsequent bench trial. Jasso filed multiple unsuccessful motions to be tried separately from Jose and Juan. Jasso also filed a motion, in which Jose and Juan joined, to bifurcate all "gang counts and gang allegations."[2] The requests for bifurcation were denied.

### Prosecution Case

The People's case included testimony from homicide detectives and a gang expert. The expert opined Jose, Juan, and Jasso were all active members of a criminal street gang called Varrio Bakers at the time of the shooting. The opinion was based on defendants' criminal history, tattoos, and content found on their social media accounts. The gang evidence is summarized in the Discussion, *post*.

Jose's girlfriend and her sister were examined as hostile witnesses. Redacted recordings of their interviews with detectives, as well as the interviews of Jose and Jasso, were admitted into evidence. Several crime scene photographs were also admitted.

---

[2]Technically, Juan did not join in Jasso's motion but filed a separate motion in limine "to clarify and limit gang evidence," which the trial court treated as a motion to bifurcate and heard in conjunction with Jasso's motion. Jose filed a similar motion to "limit" the gang evidence, which the trial court likewise construed as a motion to bifurcate, and Jose's trial counsel joined in the arguments made by Jasso's attorney during the motion hearing.

All parties agreed to a jury view of the crime scene. This occurred on the third day of evidence presentation. In addition to walking along the relevant sections of Paradise Road and Velma Avenue, the jury was driven past the "dilapidated, burnt-out house" previously occupied by Rubio's grandmother.[3]

The restaurant's surveillance video was, in the People's words, "the keystone of the prosecution's case." Over three hours of footage was admitted into evidence. A 24-hour clock on the video showed the time of day down to one-thousandth of a second, but it was reportedly off by about two minutes. All times noted herein are approximated without the two-minute adjustment and primarily stated in a 12-hour format for ease of reference. Summarized in the light most favorable to the judgment, the video depicted the following events.

At 5:07 p.m., Rubio walked southbound on Velma Avenue and veered slightly west at the intersection of Paradise Road. He continued southwest toward Jose's residence, which faced Paradise on the opposite corner of the intersection. After gesturing to someone at or near Jose's property, Rubio moved in front of the Ford Bronco and lingered there for about 25 seconds. At 5:08 p.m., Rubio took a few steps toward Jose's house and appeared to enter the driveway. He then disappeared from the camera's view for about one minute. The prosecutor alleged this was the initial dispute described by Jose and his girlfriend in their recorded interviews.

At 5:09 p.m., Rubio walked away from Jose's residence. He stopped in front of the Ford Bronco for about 45 seconds, during which time he was obscured from view. He eventually proceeded west, past the Bronco and Lincoln truck, and moved toward the sidewalk on the southern side of Paradise Road. At 5:10 p.m., he stopped at the alley and

---

[3]The trial court informed the jury, "The house was burned down and delipidated [*sic*] long before the date of the shooting. [The condition of the house] is completely unrelated to the case but there's graffiti. You haven't heard about this graffiti yet but you'll hear about it from other witnesses."

turned back toward Jose's residence as if calling out to someone.  He then turned around and continued walking toward the restaurant.  His fists were clenched as he passed by the camera and out of view.

At 5:11 p.m., Jose exited his driveway and walked into the street.  He looked west, in the direction Rubio had just gone, and appeared to be on a phone call.  This was consistent with the call log of Jose's girlfriend's sister's phone, which showed a call placed to Juan at 5:10 p.m.  At 5:13 p.m., Jose left his house and walked west on Paradise Road.  He was off camera for about five minutes and reappeared shortly before 5:19 p.m., heading east on Paradise before disappearing from view near his house.  As indicated by the call log, Jose then placed a second call to Juan.

At 5:23 p.m., Rubio walked east on Paradise Road and turned north at the Velma Avenue intersection.  Fifteen minutes later, he reappeared with an unidentified man.  They emerged from Velma Avenue, walked into the Paradise Road intersection, and stood there in conversation for half a minute.  The man then returned in the direction from which he had come, and Rubio continued walking south on Velma.

At 6:15 p.m., Jose walked out to the middle of Paradise Road.  He appeared to be on a phone call, which corresponded to the call log showing an outgoing call to Juan's phone at 6:14 p.m.  Jose eventually strolled westbound on Paradise, then came jogging back toward his house at 6:18 p.m.  Moments later, Jasso, Juan, and Kasey Villegas drove up in Jasso's black Honda Civic, stopping in front of the restaurant.  Jose walked to the north side of the street and gestured for the car to drive north through the alley running parallel to Velma Avenue.  The car pulled away from the curb and drove up the alley.  Jose walked off along the northern side of Paradise, disappearing from the camera's view after turning north on Velma.

A black sedan, which the People alleged was Jasso's car, circled through the area again at 6:29 p.m.  At 7:09 p.m., the car turned west onto Paradise Road from northbound Velma Avenue and parallel parked along the northern curb, directly across from Jose's

10.

residence. Jasso exited the car alone, crossed the street, and disappeared from view into Jose's driveway. Jose, Juan, and Kasey Villegas had evidently gone to the house on foot at some earlier point in time.[4]

At 7:14 p.m., Jose, Juan, Jasso, and Kasey Villegas exited Jose's driveway on foot and proceeded west on Paradise Road. They returned four minutes later, heading east, and Jose was now carrying a bulging plastic grocery bag. All four men appeared to be scanning the area as they walked, turning their heads and looking in various directions before moving into Jose's driveway and out of view.

The prosecutor theorized defendants had roamed the neighborhood in search of Rubio for about an hour. Unable to find him, they decided to wait outside of Jose's residence. At 7:32 p.m., Jasso walked out to the middle of Paradise Road, paused, and then returned to Jose's driveway. At 7:47 p.m., Juan came out of the driveway, proceeded west, and stood between the Ford Bronco and Lincoln pickup truck for approximately 15 seconds. He then continued west on Paradise, stopped at the alley next to the restaurant, and stood watch for about 45 seconds before returning to Jose's driveway. Meanwhile, Jose walked out onto Paradise Road, looked around, and was joined by Jasso near the front end of the Bronco. By 7:50 p.m., all three had returned to Jose's driveway and were no longer visible on camera.

At 8:00 p.m., Rubio walked past the restaurant along the southern curb of Paradise Road. He was holding a bottle of beer in his left hand.[5] Shortly before moving past the alley, he entered the street and continued on a northeastward trajectory toward Velma Avenue, taking a swig of his beer while passing by the Lincoln pickup truck. At virtually

---

[4]The video shows movement outside of Jose's residence, near the corner of Paradise Road and Velma Avenue, at 6:32 p.m. About one minute later, a person resembling Kasey Villegas comes into view and then walks off camera at the approximate location of Jose's driveway.

[5]Sheriff's deputies later found an aluminum Bud Light beer bottle near Rubio's body. It was visible in some of the crime scene photographs admitted at trial.

11.

the same moment (20:00:57 on the video clock), Jasso exited the driveway and walked in front of the Ford Bronco. Six seconds later, Juan appeared on camera.

Juan also stepped in front of the Bronco, but he was closer to it than Jasso. Rubio suddenly turned to his right (i.e., toward Juan), took a step backwards while extending both arms out from his waist, then staggered farther backwards and fell down in between the Bronco and the pickup truck. He ceased to be visible at approximately 20:01:07 on the video clock.

Jasso had first come into view at approximately 20:00:57 and remained in front of the Bronco until approximately 20:01:09. Juan came into view at approximately 20:01:03, disappeared in front of the Bronco at 20:01:05, and reappeared at 20:01:10 running toward Jasso's parked car across the street. Meanwhile, Jose and Kasey Villegas stepped out of the driveway and into the camera's view at 20:01:07. Kasey turned back around almost immediately, and Jose did the same approximately one second later. Jasso, from his position in front of the Bronco, very briefly moved in the direction of Jose and Kasey but then turned and ran across the street to his car (arriving there a few steps behind Juan). A few seconds later, Kasey ran after Juan and Jasso and fled with them in Jasso's vehicle.

Jasso drove west on Paradise Road at 8:01 p.m. His vehicle disappeared from the camera's view when the video clock hit 20:01:30. At 8:02 p.m., Jose and his girlfriend exited the driveway. Jose jogged over to where Rubio lay, knelt down for a few seconds, then stood up and jogged back to his house. Jose's girlfriend walked around the Bronco and momentarily looked down at Rubio before moving in between the vehicles and out of view for about 30 seconds. Unidentified onlookers began to approach the scene and watched from a distance as Jose's girlfriend paced back and forth near Rubio's body, appearing to talk on a phone.

At 8:04 p.m., a person later alleged to be Jose's neighbor walked in between the vehicles and disappeared from the camera's view. About 24 seconds later, he returned to

12.

the southern curb of Paradise Road and handed something to an unknown person.  A sheriff's deputy pulled up in a patrol car shortly thereafter.

***Defense Case***

Jasso's defense was mere presence during the shooting.  He testified on his own behalf.  His attorney introduced photographs of Rubio displaying "gang signs" with his hands and fingers, which had been uploaded to Rubio's Facebook account one day prior to his death.  Defense counsel also introduced what had reportedly been Rubio's Facebook "cover photo" in November 2015, i.e., two years prior to the shooting.  It is described in the record as "a photograph of two semi-automatic pistols with the words 'May God have mercy on my enemies because I won't.'"

Jasso preemptively stipulated to being "an active participant in the Varrio Bakers" and to "knowingly sell[ing] illegal narcotics for a profit with other members of the Varrio Bakers."  He alleged Jose, Juan, and Kasey Villegas were fellow Varrio Bakers members.  Jasso also admitted to having made false statements during his custodial interview.

Regarding the day of the shooting, Jasso testified, "Juan had called me, told me he wanted to go visit with Jose and his kids.  [Jose] had just moved into his new house."  Jasso agreed to drive Juan to Lamont in his Honda Civic.  Kasey Villegas joined them.

Jasso testified there was never any discussion among the group about Rubio or the possibility of a confrontation in Lamont.  His expectations for the trip were to "have a couple of beers, smoke a blunt, [and] catch up with Jose."  Rubio was a person completely unknown to him, even at the time of the shooting.  He stated, "I never knew who he was.  The first time I heard about him was when I got arrested for this case."

In his initial telling of the events, Jasso omitted nearly an hour's worth of activity.  He testified to arriving in Lamont with Juan and Kasey, smoking marijuana with them while parked in front of Jose's house, getting out and socializing with Jose in the front yard "for a little bit," and then walking to the store to purchase some Tecate beer.  Jasso

13.

confirmed the video footage at 7:14 p.m. and 7:19 p.m. showed the four of them on their beer errand.

On cross-examination, Jasso admitted that the video showed him exiting his parked car alone at 7:09 p.m. and walking to Jose's residence. The prosecutor asked where he had been "for almost an hour, 51 minutes about, after you first arrived in Lamont[?]" Jasso testified to dropping Juan and Kasey off on the Velma Avenue side of Jose's residence "when we first arrived," then traveling alone to the town of Arvin to deliver a package of cocaine. This was not entirely consistent with the footage of Jose standing in the street at 6:18 p.m., directing Jasso away from his house, and Jasso proceeding to drive north with his passengers still in the vehicle. In other testimony, Jasso alleged Jose had been pointing in the direction of where he intended to meet someone to buy marijuana.

Jasso gave the following testimony about the shooting: "As I'm—as we're walking out of the gate, I had to leave early to go pick up my girl from work and as we're walking out, I don't know. I guess I thought it was one of Jose's friends or something. He just—Jose told him like, 'I told you I'm not trippin.' [¶] [Rubio] goes, 'I don't give a fuck. I'm keeping my palabra [word].'"

After follow-up questions about Jose's and Rubio's exact statements, Jasso continued: "Yeah, it was something like that because me and Kasey were walking out. We were talking. I heard Jose say something about, 'I already told you I'm not trippin.' The car is right here. As I come around, I see someone approaching us. [¶] He's already saying, 'I don't give a fuck. I already told you. I keep my palabra' …."

Jasso's attorney asked, "Did you see [Rubio] with something in his hand?" Jasso answered, "Yes, well, he grabbed—he went under his shirt. He pulled out like those little—you know those guns off the side races, those little black revolvers from the

movies that they show when they start the race." Defense counsel then asked, "You saw him with a small handgun?" Jasso replied, "Yeah, it's like a revolver."**6**

Describing the sequence of events, Jasso testified: "So I seen him pull it out. I dodged behind the car. I just heard four pops, so I thought we were getting shot at and [Jose's child] was outside. [¶] … [¶] So I ran to the gate and closed the gate and then when I turned back around, it was just like [Rubio] wasn't standing there no more so we took off."**7**

Jasso denied knowing Rubio had been shot when he fled the scene. He testified, "[T]o my understanding, [Rubio] was the one that was shooting at us." When Jasso, Juan, and Kasey got into the car, Juan asked, "'You guys all right?'" Jasso claimed to have replied, "'Yeah, fuck. I'll take you guys home. I have to pick up my bitch.'" His testimony indicated there was no discussion of the incident on the drive back to Bakersfield. Jasso did not ask Juan about the person who had shot at them, i.e., Rubio, because he "was pretty sure Juan wouldn't know who he was either."

---

**6**On cross-examination, the prosecutor had Jasso confirm the gun he allegedly saw in Rubio's possession was a revolver. This was an important detail because, as explained by a law enforcement witness, when an automatic pistol is fired the spent bullet casing is "ejected from the firearm[,] which causes the following rounds to be loaded into the barrel or chamber if there's accompanying rounds in it." When shots are fired from a revolver, however, the empty casings remain inside the gun until manually removed. Although one of the casings found at the scene was of a different brand than the other three, that did not necessarily indicate the use of two guns. But if there were two gunmen, Rubio's alleged possession of a *revolver* meant the second shooter was almost certainly not him.

**7**Jasso's reference to the "gate" was not explained, but it likely made sense to the jury given their trip to the crime scene. The crime scene photos showed chain link fencing in front of Jose's house and the home of his neighbor. The neighbor's driveway, located between the Ford Bronco and Lincoln truck, was blocked by a metallic fence-like gate. Jose may have had a similar gate for his driveway, but the space was open in the photos admitted at trial. In any event, the prosecutor argued Jasso's testimony about closing the gate was demonstrably false. His movement toward Jose's house before running in the opposite direction happened in less than two seconds, and Jose was in front of Jasso when Jasso turned around to flee.

15.

Jose rested his defense case without introducing any evidence. Like Jasso, he relied on a theory of mere presence. His trial counsel argued Jose had truthfully told detectives that he did not see who fired the shots. Counsel also disputed the People's theory of aiding and abetting, claiming the evidence allowed for a reasonable doubt on the element of intent. Jose's attorney did not argue self-defense.

Juan did not call any witnesses, but his attorney introduced additional content from Rubio's Facebook account to argue Rubio was a Varrio Chico Lamont gang member or associate. Building upon Jasso's testimony about Rubio being armed, Juan's counsel alleged certain video footage showed a black handgun in Rubio's waistband. Counsel offered multiple alternative defense theories during closing argument, including self-defense and defense of others.

### Verdicts and Sentencing

The jury deliberated for approximately 14 hours over the course of three days. On the third day, toward the end of its deliberations, it submitted questions about section 190.2(a)(22) and later reported being evenly divided on whether defendants killed Rubio to further the activities of a criminal street gang. A mistrial was declared as to the gang special circumstance allegation, which was ultimately dismissed. Defendants were otherwise convicted as charged and all remaining allegations were found true. The recidivism allegations against Juan were sustained by the trial court.

Juan was sentenced to life in prison without the possibility of parole (LWOP) for first degree murder committed by means of lying in wait. Sentencing on count 1 included consecutive terms of 25 years to life for the firearm enhancement, 10 years for the gang enhancement, and 10 years for two prior serious felony convictions. Punishment imposed for counts 2 and 3, which was said to include 2 one-year terms for the prison priors, was ordered stayed pursuant to section 654.

Jose's count 1 sentence was LWOP plus a consecutive term of 25 years to life for the firearm enhancement. Because the latter term was imposed pursuant to section

12022.53, subdivision (e)(1), punishment for the separate gang enhancement was stayed (see *id.*, subd. (e)(2)). Punishment for count 2 was stayed pursuant to section 654.

Jasso's count 1 sentence was LWOP plus 25 years to life for the firearm enhancement. The gang enhancement was omitted from the pronouncement of judgment without explanation. Punishment for count 2 was stayed pursuant to section 654.

## DISCUSSION

### I.      Sufficiency of the Evidence[*]

Jasso's murder conviction was based on a theory of aiding and abetting. He seeks reversal of count 1 for insufficient evidence. The People dispute the claim.

#### A.      Standard of Review

"On appeal, the test of legal sufficiency is whether there is substantial evidence, i.e., evidence from which a reasonable trier of fact could conclude that the prosecution sustained its burden of proof beyond a reasonable doubt." (*People v. Boyer* (2006) 38 Cal.4th 412, 479.) We construe the record in the light most favorable to the judgment and presume "'the existence of every fact the jury could reasonably have deduced from the evidence.'" (*People v. Mendez* (2019) 7 Cal.5th 680, 702.) "'Substantial evidence includes circumstantial evidence and any reasonable inferences drawn from that evidence.'" (*People v. Grant* (2020) 57 Cal.App.5th 323, 330.)

It is the jury's role "to decide whether an inference should be drawn and the weight to be accorded the inference." (*People v. Massie* (2006) 142 Cal.App.4th 365, 374.) "Although it is the jury's duty to acquit a defendant if it finds the circumstantial evidence susceptible of two reasonable interpretations, one of which suggests guilt and the other innocence, it is the jury, not the appellate court that must be convinced of the defendant's guilt beyond a reasonable doubt." (*People v. Kraft* (2000) 23 Cal.4th 978, 1053–1054.) "If the circumstances reasonably justify the jury's findings, the reviewing

---

[*]See footnote, *ante*, page 1.

court may not reverse the judgment merely because it believes that the circumstances might also support a contrary finding." (*People v. Ceja* (1993) 4 Cal.4th 1134, 1139; accord, *People v. Ghobrial* (2018) 5 Cal.5th 250, 278.)

### B. Law and Analysis

An aider and abettor is one who acts "with knowledge of the criminal purpose of the perpetrator and with an intent or purpose either of committing, or of encouraging or facilitating commission of, the offense." (*People v. Beeman* (1984) 35 Cal.3d 547, 560.) To be guilty of first degree murder, the aider and abettor must share the mens rea of the actual killer. (See § 188, subd. (a)(3); *People v. Gonzalez* (2012) 54 Cal.4th 643, 653 ["A person who kills unlawfully and intentionally is guilty of first degree murder if the intent to kill is formed after premeditation and deliberation"].) The required actus reus is conduct "that in fact assists the achievement of the crime." (*People v. Perez* (2005) 35 Cal.4th 1219, 1225.)

Jasso argues he was not shown to have encouraged or assisted in the murder of Rubio. To assess his claim, we consider the factors of "'presence at the scene of the crime, companionship, and conduct before and after the offense.'" (*People v. Nguyen* (2015) 61 Cal.4th 1015, 1054.) "'Mere presence at the scene of a crime which does not itself assist its commission or mere knowledge that a crime is being committed and the failure to prevent it does not amount to aiding and abetting.'" (*People v. Pettie* (2017) 16 Cal.App.5th 23, 57.) Whether Jasso provided assistance is a question of fact, so "all conflicts in the evidence and reasonable inferences must be resolved in favor of the judgment." (*People v. Mitchell* (1986) 183 Cal.App.3d 325, 329.)

The video evidence is fairly interpreted as showing more than Jasso's mere presence during the shooting. He walked out onto Paradise Road several seconds before Juan appeared on camera, during which time Rubio was heading northeast toward Velma Avenue. Jasso testified that Rubio approached him and Kasey Villegas as they were

18.

walking to Jasso's car, but the video permits the finding it was Jasso who approached Rubio. Kasey Villegas did not enter the street until approximately 10 seconds later, after Rubio had been shot, and he was walking behind Jose.

Jose's trial counsel argued the video showed Rubio having some kind of "reaction" at or near the time Juan walked in front of the Bronco. Juan's trial counsel similarly argued Rubio was already "reacting to something in front of him" and it was "doubtful" he could see Juan, who was farther off to his right, because the Bronco was in between them. The video and surrounding circumstances support the inference Jasso engaged with Rubio as a diversionary measure, i.e., he distracted Rubio to help facilitate the ambush by Juan. Such behavior constitutes aiding and abetting. (See, e.g., *People v. Ngaue* (1992) 8 Cal.App.4th 896, 906–907.)

In his reply brief, Jasso argues "[a] distraction was not necessary for Juan to safely shoot Rubio." He misses the point. "The 'act' required for aiding and abetting liability need not be a substantial factor in the offense." (*People v. Swanson-Birabent* (2003) 114 Cal.App.4th 733, 743; accord, *People v. Franzen* (2012) 210 Cal.App.4th 1193, 1216.) "'It has been held, therefore, that one who is present for the purpose of diverting suspicion, or to serve as a lookout, or to give warning of anyone seeking to interfere, … or to drive the "getaway" car and to give direct aid to others in making their escape from the scene of the crime, is a principal in the crime committed.'" (*Swanson-Birabent*, at pp. 743–744.)

"Giving a false statement evincing consciousness of guilt is another circumstance tending to prove aiding and abetting." (*People v. Glukhoy* (2022) 77 Cal.App.5th 576, 602; see *People v. Showers* (1968) 68 Cal.2d 639, 643 ["False statements regarding incriminating circumstances constitute evidence which may support an inference of consciousness of guilt"].) The jury may thus have considered Jasso's dishonesty in his custodial interview and on the witness stand. He initially denied even being in Lamont on the day of the shooting. When detectives showed him a surveillance image of his

19.

vehicle, he told them, "It's not my car." At trial he claimed to have "dodged behind the car" upon seeing Rubio reach for a gun, but the video showed Jasso was in the street and in front of the Bronco the entire time. The jury could have also concluded, as argued by the prosecutor, the video disproved Jasso's testimony that he "ran to the gate and closed the gate" before fleeing.

"As noted, a defendant's conduct after a crime, including flight, is a relevant factor in determining his liability for aiding and abetting the crime." (*People v. Garcia* (2008) 168 Cal.App.4th 261, 274.) Jasso's flight was especially probative considering he drove Juan to and from the crime scene. He testified Juan was a fellow gang member, a frequent companion, and someone he had known "for a long time." Juan ran directly to Jasso's car after shooting Rubio, clearly expecting the assistance in flight that Jasso provided.

The evidence permitted the inference the trip to Lamont was directly related to Jose's problems with Rubio. (See *People v. Glukhoy*, *supra*, 77 Cal.App.5th at p. 599 ["Motive is another circumstance to be considered in determining aiding and abetting liability"].) Jasso admitted Jose was a friend and fellow gang member, and the jury was free to disbelieve his professed ignorance about the dispute with Rubio. For all these reasons, we reject Jasso's claim of insufficient evidence.

## II. Assembly Bill 333

Assembly Bill 333 was enacted during the pendency of this appeal. Defendants claim its amendments to section 186.22 apply retroactively and warrant reversal of their count 2 convictions and gang-related enhancements. The People concede those arguments. Defendants further contend that section 1109, a new procedural statute concerning gang charges and enhancements, applies retroactively and entitles them to complete reversal of the judgments. The People dispute the section 1109 claims. We

20.

agree with defendants on the question of retroactivity but reject the claims regarding prejudice.

### A. Overview

Section 186.22 prohibits unlawful participation in a criminal street gang, as set forth in subdivision (a), and includes sentencing enhancement provisions, which are found in subdivision (b). The statute also has alternate penalty provisions, section 186.22, subdivisions (b)(4), (5), and (d), the latter of which allows for punishment of up to three years in prison if the defendant is "convicted of a gang-related misdemeanor offense." (*People v. Briceno* (2004) 34 Cal.4th 451, 460, fn. 7.)

A criminal street gang is "an ongoing, organized association or group of three or more persons, whether formal or informal, having as one of its primary activities the commission of one or more of the criminal acts enumerated in subdivision (e), having a common name or common identifying sign or symbol, and whose members collectively engage in, or have engaged in, a pattern of criminal gang activity." (§ 186.22, subd. (f).)

A "'pattern of criminal gang activity' means the commission of, attempted commission of, conspiracy to commit, or solicitation of, sustained juvenile petition for, or conviction of" two or more offenses listed in section 186.22, subdivision (e), if such conduct occurred within certain time frames and under particular circumstances specified therein. (§ 186.22, subd. (e)(1).) This is commonly known as the "predicate offenses" requirement. (*People v. Navarro* (2021) 12 Cal.5th 285, 311.)

"The elements of the gang participation offense in section 186.22[,] [subdivision] (a) are: First, active participation in a criminal street gang, in the sense of participation that is more than nominal or passive; second, knowledge that the gang's members engage in or have engaged in a pattern of criminal gang activity; and third, the willful promotion, furtherance, or assistance in any felonious criminal conduct by members of that gang." (*People v. Rodriguez* (2012) 55 Cal.4th 1125, 1130.) The enhancements and alternate

21.

penalty provisions apply only to gang-related crimes, meaning offenses "committed for the benefit of, at the direction of, or in association with a criminal street gang." (§ 186.22, subds. (b), (d); accord, *People v. Livingston* (2012) 53 Cal.4th 1145, 1170.) The enhancements and alternate penalties further require "the specific intent to promote, further, or assist in criminal conduct by gang members." (§ 186.22, subds. (b)(1), (4), (d).)

By enactment of Assembly Bill 333, section 186.22 has new requirements for establishing liability under subdivisions (a), (b), and (d). (Stats. 2021, ch. 699, § 3.) As of January 1, 2022, predicate offenses must be shown to have "commonly benefited" the alleged gang, and the common benefit must have been "more than reputational." (§ 186.22, subd. (e)(1).) Currently charged offenses no longer qualify (*id*., subd. (e)(2)), and at least one predicate offense must have been committed "within three years of the date the current offense is alleged to have been committed …" (*id*., subd. (e)(1)). Among other additional changes, the terms "benefit," "promote," "further," and "assist" are now defined to mean providing "a common benefit to members of a gang where the common benefit is more than reputational." (*Id*., subd. (g).)

Assembly Bill 333 also added section 1109. (Stats. 2021, ch. 699, § 5.) The new statute provides:

> "(a) If requested by the defense, a case in which a gang enhancement is charged under subdivision (b) or (d) of Section 186.22 shall be tried in separate phases as follows:

> "(1) The question of the defendant's guilt of the underlying offense shall be first determined.

> "(2) If the defendant is found guilty of the underlying offense and there is an allegation of an enhancement under subdivision (b) or (d) of Section 186.22, there shall be further proceedings to the trier of fact on the question of the truth of the enhancement. Allegations that the underlying offense was committed for the benefit of, at the direction of, or in association with, a criminal street gang and that the underlying offense was committed with the specific intent to promote, further, or assist in criminal

22.

conduct by gang members shall be proved by direct or circumstantial evidence.

"(b) If a defendant is charged with a violation of subdivision (a) of Section 186.22, this count shall be tried separately from all other counts that do not otherwise require gang evidence as an element of the crime. This charge may be tried in the same proceeding with an allegation of an enhancement under subdivision (b) or (d) of Section 186.22."

## B.     Retroactivity of Amendments to Section 186.22

Section 3 states that no part of the Penal Code is retroactive "unless expressly so declared." However, in *In re Estrada* (1965) 63 Cal.2d 740 (*Estrada*), an amendment to a criminal statute was held to apply retroactively despite the Legislature's failure to expressly declare such an intent. (*Id.* at pp. 742–745.) The rationale for this outcome has come to be known as the "*Estrada* rule." (E.g., *People v. Frahs* (2020) 9 Cal.5th 618, 624 (*Frahs*).) In brief, "[w]hen new legislation reduces the punishment for an offense, we presume that the legislation applies to all cases not yet final as of the legislation's effective date." (*People v. Esquivel* (2021) 11 Cal.5th 671, 673.)

The *Estrada* rule has been applied "to statutes that merely made a reduced punishment *possible*." (*Frahs*, *supra*, 9 Cal.5th at p. 629.) In *People v. Superior Court* (*Lara*) (2018) 4 Cal.5th 299 (*Lara*), the inference of retroactivity was extended to legislation that "ameliorated the possible punishment for a class of persons." (*Id.* at p. 308.) In *Frahs*, a pretrial diversion statute (§ 1001.36) was held to apply retroactively because it "offers a potentially ameliorative benefit for a class of individuals—namely, criminal defendants who suffer from a qualifying mental disorder." (*Frahs*, at p. 631.) Further inferences of retroactive intent were drawn from the Legislature's stated goal of "'[i]ncreased diversion of individuals with mental disorders to mitigate the individuals' entry and reentry into the criminal justice system …,'" and because "the procedures instituted by the enactment carry the potential of substantial reductions in punishment for the aforementioned parties." (*Ibid.*)

23.

The *Frahs* opinion holds "that in order to rebut *Estrada*'s inference of retroactivity concerning ameliorative statutes, the Legislature must 'demonstrate its intention with sufficient clarity that a reviewing court can discern and effectuate it.'" (*Frahs*, *supra*, 9 Cal.5th at p. 634.) Assembly Bill 333 "increases the threshold for conviction of the section 186.22 offense and the imposition of the enhancement" (*People v. Lopez* (2021) 73 Cal.App.5th 327, 344), which obviously confers potentially ameliorative benefits upon a class of persons to which defendants belong. (See *Tapia v. Superior Court* (1991) 53 Cal.3d 282, 301 [*Estrada* rule applies "to statutes which redefine, to the benefit of defendants, conduct subject to criminal sanctions"].) We thus conclude the amendments to section 186.22 apply retroactively in this case.

The parties' arguments for reversal of the count 2 convictions and the gang enhancements are sound. The People concede their gang expert "failed to describe how the predicate offenses commonly benefited the gang, as required under the new legislation." "The proper remedy for this type of failure of proof—where newly required elements were 'never tried' to the jury—is to remand and give the People an opportunity to retry the affected charges." (*People v. E.H.* (2022) 75 Cal.App.5th 467, 480; accord, *People v. Rodriguez* (2022) 75 Cal.App.5th 816, 822–823; *People v. Lopez*, *supra*, 73 Cal.App.5th at p. 346.)

Jasso and Jose further contend that reversal of the gang enhancements invalidates their firearm enhancements, which were imposed pursuant to section 12022.53, subdivisions (d) and (e)(1). The People acknowledge the claim but do not expressly concede it. The claim has merit.

"Ordinarily, section 12022.53's sentence enhancements apply only to *personal* use or discharge of a firearm in the commission of a statutorily specified offense, but when the offense is committed to benefit a criminal street gang, the statute's additional punishments apply even if, as in this case, [a] defendant did not personally use or discharge a firearm but another principal did." (*People v. Brookfield* (2009) 47 Cal.4th

24.

583, 589.) Jose and Jasso were not found to have personally used or discharged a firearm, so reversal of the gang findings eliminates the only basis for liability under section 12022.53. Their gun enhancements must therefore be vacated. (*People v. Lopez*, *supra*, 73 Cal.App.5th at pp. 347–348; *People v. Cornejo* (2016) 3 Cal.App.5th 36, 43, 50.)

### C.        Retroactivity of Section 1109

There is a split of authority on the retroactive application of section 1109. In *People v. Burgos* (2022) 77 Cal.App.5th 550 (*Burgos*), a divided panel of the Sixth Appellate District held the statute applies retroactively to nonfinal judgments. (*Id*. at pp. 564–568.) In *People v. Ramos* (2022) 77 Cal.App.5th 1116, this district reached the same conclusion. (*Id*. at p. 1119.) Division Three of the Second Appellate District took an opposing view in *People v. Perez* (2022) 78 Cal.App.5th 192 (*Perez*), holding "that the statute does not apply retroactively to a trial that has already occurred." (*Id*. at p. 207.) The People urge us to follow *Perez* and the dissent in *Burgos*.[8] We decline to do so.

"Our inquiry into legislative intent begins, as always, with the statutory text." (*People v. Lopez* (2022) 12 Cal.5th 957, 971.) Section 1109 contains two provisions. The first requires bifurcation of gang enhancement allegations if requested by the defense. (§ 1109, subd. (a).) The second requires counts alleging violations of section 186.22, subdivision (a) to be "tried separately from all other counts that do not otherwise require gang evidence as an element of the crime." (§ 1109, subd. (b).)

---

[8]After briefing was completed in this matter, the Sixth Appellate District published another opinion addressing this issue, *People v. Ramirez* (2022) 79 Cal.App.5th 48. There, the majority of a divided panel "adopt[ed] the analysis in Justice Elia's dissent in *Burgos*" and held section 1109 does not apply retroactively to nonfinal judgments. (*Ramirez*, at p. 65.) Writing separately, Justice Wilson concurred in the result reached by the *Ramirez* majority but opined that section 1109 "is ameliorative within the meaning of the *Estrada* rule and therefore retroactive as well." (*Id*. at p. 67.)

Section 1109 contains no express declaration of retroactivity. However, there is a statement of legislative findings in an uncodified section of Assembly Bill 333. (Stats. 2021, ch. 699, § 2.) "An uncodified section is part of the statutory law." (*Carter v. California Dept. of Veterans Affairs* (2006) 38 Cal.4th 914, 925.) We therefore consider the following declarations of the Legislature:

> "According to the Committee on Revision of the Penal Code's 2020 report: [¶] … [¶] Gang enhancement evidence can be unreliable and prejudicial to a jury because it is lumped into evidence of the underlying charges which further perpetuates unfair prejudice in juries and convictions of innocent people." (Stats. 2021, ch. 699, § 2, subd. (d)(6).)

> "California courts have long recognized how prejudicial gang evidence is. [Citation.] Studies suggest that allowing a jury to hear the kind of evidence that supports a gang enhancement before it has decided whether the defendant is guilty or not may lead to wrongful convictions. [Citations.] The mere specter of gang enhancements pressures defendants to accept unfavorable plea deals rather than risk a trial filled with prejudicial evidence and a substantially longer sentence." (Stats. 2021, ch. 699, § 2, subd. (e).)

> "Bifurcation of trials where gang evidence is alleged can help reduce its harmful and prejudicial impact." (Stats. 2021, ch. 699, § 2, subd. (f).)

The dissenting opinion in *Burgos* discussed the quoted excerpts and conceded the Legislature "expressed the belief that bifurcation could help reduce the risk of prejudice." (*Burgos*, *supra*, 77 Cal.App.5th at p. 570 (dis. opn. of Elia, J.).) The *Burgos* dissent also recognized that our state Supreme Court has construed new laws as "'ameliorative'" if they potentially eliminate punishment for an offense. (*Id*. at p. 572, quoting *Frahs*, *supra*, 9 Cal.5th at p. 631.) However, the dissenting opinion concluded "section 1109 is not an *ameliorative* statute within the meaning of the *Estrada* rule," but rather "a 'purely procedural' change … that will not have any impact 'directly' or indirectly on *punishment*." (*Burgos*, at pp. 569, 572.) We disagree. The uncodified preamble in Assembly Bill 333 clearly reflects the Legislature's intent to eliminate or reduce what it

26.

views as unwarranted punishment stemming from the admission of prejudicial gang evidence.

The *Perez* opinion does not go into depth on the issue. It states that "[u]nlike the new law in *Lara*, which was a new procedural law that had the effect of potentially reducing the punishment for a class of defendants, here, section 1109 is a procedural statute that ensures a jury will not be prejudiced by the introduction of evidence to support gang enhancement allegations—it does not reduce the punishment imposed." (*Perez*, s*upra*, 78 Cal.App.5th at p. 207.) We do not follow this reasoning. In *Lara*, the California Supreme Court acknowledged "*Estrada* is not directly on point" if the statute in question "does not reduce the punishment for a crime." (*Lara*, *supra*, 4 Cal.5th at p. 303.) "But its rationale does apply" if the new legislation "reduces the possible punishment for a class of persons." (*Ibid*.) A possible reduction in the extent of punishment and the possibility of avoiding any punishment whatsoever are both "potentially ameliorative benefit[s]." (*Frahs*, *supra*, 9 Cal.5th at p. 631.)

Section 1109 is intended to "reduce [the] harmful and prejudicial impact" of gang evidence (Stats. 2021, ch. 699, § 2, subd. (f)), and ultimately prevent wrongful convictions and unfair plea bargains (*id*., subds. (d)(6), (e)). The "increased possibility of acquittal … necessarily reduces possible punishment." (*Burgos*, *supra*, 77 Cal.App.5th at p. 567.) Likewise, "[b]y reducing the pressure to accept longer sentences, [section 1109] will necessarily reduce the degree of punishment for many defendants charged with gang enhancements, even if they never have to invoke its prophylactic protections at trial." (*Ibid*.; see Stats. 2021, ch. 699, § 2, subd. (e).)

The People argue that "until *Burgos*, no case had ever applied the *Estrada* exception to the rule of nonretroactivity stated in section 3 to a statute like section 1109 that does not alter the punishment or the required elements." We disagree. The statute at issue in *Frahs* does not alter the prescribed punishment for, or the required elements of, any offense. "[S]ection 1001.36 by design and function provides a possible ameliorating

27.

benefit for a class of persons—namely, certain defendants with mental disorders—by offering an opportunity for diversion and ultimately the dismissal of charges." (*Frahs*, *supra*, 9 Cal.5th at p. 624.)  The "potentially ameliorative benefit" is the possibility of avoiding being tried, convicted, and sentenced for alleged criminal behavior.  (*Id*. at p. 631.)

The People also overlook *Frahs* by arguing "[a] legislative reduction in punishment does not exist when defendants who were lawfully convicted and punished under pre-2022 procedures would still be lawfully convicted and subject to identical punishment under 2022 procedures."  They restate the argument this way:  "A defendant who receives the benefit of a severed or bifurcated trial may ultimately receive the same sentence he or she could have received without severance or bifurcation.  Although the persuasiveness of the evidence at trial on the underlying offenses might be impacted, the potential punishment for a defendant is not reduced by section 1109."

The *Frahs* appellant had already been tried and convicted of two felonies, and an appeal of the judgment was pending, when section 1001.36 went into effect.  (*Frahs*, *supra*, 9 Cal.5th at pp. 625–626.)  Retroactive application of the pretrial diversion statute did not guarantee a change in the judgment.  The appellant still needed to demonstrate eligibility for diversion on remand and, if eligible, persuade the trial court to grant relief under section 1001.36 and, if granted relief, perform successfully in a diversion program.  (*Frahs*, at p. 641.)  If any of those contingencies did not occur, the appellant's convictions and sentence were to be reinstated.  (*Ibid*.)  What made the statute "ameliorative" was the possibility of a more favorable outcome that did not exist prior to its enactment.  (See *id*. at p. 631.)

Because it "provides a possible benefit to a class of criminal defendants and the statute does not contain an express savings clause that limits the [procedures] to prospective-only application, the specific question before us boils down to whether the Legislature 'clearly signal[ed] its intent' to overcome the *Estrada* inference that section

28.

[1109] applies retroactively to all cases not yet final on appeal." (*Frahs*, *supra*, 9 Cal.5th at pp. 631–632.) The People fail to identify any such indicators in Assembly Bill 333 or its legislative history. The only argument presented is that "deeming section 1109 to be retroactive would also impose an unsurmountable financial burden and prevent judicial economy."

The People cite to a statement in the *Burgos* dissent: "[The Legislature] relied on a fiscal analysis of the bifurcation provisions in section 1109 that was based on the assumption that the provisions would apply only prospectively. (Sen. Com. on Appropriations, Analysis of Assem. Bill No. 333 (2021–2022 Reg. Sess.) as amended July 13, 2021, p. 3.)" (*Burgos*, *supra*, 77 Cal.App.5th at p. 571 (dis. opn. of Elia, J.).) But what the Appropriations Committee said was that the fiscal impact of Assembly Bill 333 is unknown and difficult to predict. (Sen. Com. on Appropriations, Analysis of Assem. Bill No. 333, *supra*, pp. 1, 3.) Although section 1109 may increase "workload costs to the courts" (*id.*, p. 3), it could also produce "cost savings to [the California Department of Corrections and Rehabilitation] if it results in some individuals serving a shorter (or no) term of imprisonment" (*id.*, p. 4). This is not a clear indication of the Legislature's intent for prospective-only application. (Cf. *Frahs*, *supra*, 9 Cal.5th at p. 635 ["[F]or an individual like defendant, who is currently serving a nine-year prison sentence, participation in a mental health diversion program rather than serving the remainder of his sentence could potentially result in substantial cost savings to the state"].) Accordingly, we conclude section 1109 applies retroactively to nonfinal judgments.

Juan contends retroactive application of section 1109 "results in structural error or, alternatively, [his entire] judgment must be reversed because of actual prejudice …." Jasso and Jose make similar arguments. The structural error claim relies on *Burgos*, *supra*, 77 Cal.App.5th at page 568, which we do not find persuasive. "There is a strong presumption that any error falls within the trial error category," i.e., is not structural, and

29.

thus "subject to harmless error analysis." (*People v. Anzalone* (2013) 56 Cal.4th 545, 554; see, e.g., *People v. Mendoza* (2000) 24 Cal.4th 130, 162 ["Even if a trial court's severance or joinder ruling is correct at the time it was made, a reviewing court must reverse the judgment if the 'defendant shows that joinder actually resulted in "gross unfairness" amounting to a denial of due process'"].)

Defendants' ability to demonstrate prejudice depends on whether section 1109 affects the statutory scheme governing special circumstance allegations. In other words, prejudice cannot be shown if all the gang evidence would have been admitted due to the allegation of a gang murder for purposes of section 190.2(a)(22). We must therefore determine the interplay between section 1109 and section 190.1 et seq.[9]

## D.     Section 1109 Does Not Apply to Section 190.1 et seq.

Assembly Bill 333 has been held to affect "other statutes that expressly incorporate provisions of section 186.22," including the "gang murder special circumstance" provision of section 190.2. (*People v. Lopez*, *supra*, 73 Cal.App.5th at p. 346.) Section 190.2 makes first degree murder punishable by death or LWOP if "[t]he defendant intentionally killed the victim while the defendant was an active participant in a criminal street gang, as defined in subdivision (f) of Section 186.22, and the murder was carried out to further the activities of the criminal street gang." (§ 190.2(a)(22).) "As the definition of a criminal street gang has been narrowed by Assembly Bill 333 and

---

[9]All three defendants claim section 1109 requires bifurcation of special circumstance allegations pleaded under section 190.2(a)(22). The People were given the opportunity to refute the argument but chose not to address it. The People's position is that retroactive application of section 1109 would not require reversal of the murder convictions under any circumstances because prejudice could not be shown.

Juan additionally contends that section 1109 requires bifurcation of gun enhancement allegations pleaded under section 12022.53, subdivision (e). However, Juan's firearm enhancement was imposed pursuant to section 12022.53, subdivision (d), meaning it was not dependent upon the gang findings. Because the issue does not affect Juan's judgment, we decline to reach the merits of his claim.

30.

new elements added in order to prove a criminal street gang and a pattern of criminal activity," the requirements for establishing liability under section 190.2(a)(22) have also changed. (*Lopez*, at p. 347.) Section 190.2 does not, however, contain any references to section 1109.

Section 1109 says nothing about the special circumstance statutes, and its provisions are specific to section 186.22, subdivisions (a), (b), and (d). Moreover, the procedures required by section 1109 conflict with the procedures set forth in section 190.1 et seq. For that reason, we first consider whether bifurcation of a gang special circumstance allegation is even permissible.[10]

Section 190.1 provides, in relevant part:

> "A case in which the death penalty may be imposed pursuant to this chapter shall be tried in separate phases as follows:

> "(a) The question of the defendant's guilt shall be first determined. If the trier of fact finds the defendant guilty of first degree murder, it shall at the same time determine the truth of all special circumstances charged as enumerated in Section 190.2 except for a special circumstance charged pursuant to paragraph (2) of subdivision (a) of Section 190.2 where it is alleged that the defendant had been convicted in a prior proceeding of the offense of murder in the first or second degree.

> "(b) If the defendant is found guilty of first degree murder and one of the special circumstances is charged pursuant to paragraph (2) of subdivision (a) of Section 190.2 which charges that the defendant had been convicted in a prior proceeding of the offense of murder of the first or second degree, there shall thereupon be further proceedings on the question of the truth of such special circumstance."

---

[10] The general authority to bifurcate trial issues is found in section 1044, "which vests the trial court with broad discretion to control the conduct of a criminal trial." (*People v. Calderon* (1994) 9 Cal.4th 69, 74–75.) Bifurcation "'means that different issues in a case will be tried *seriatim* by the *same* jury with the jury returning separate verdicts as to the issues bifurcated. There is but one trial.'" (*People v. Givan* (1992) 4 Cal.App.4th 1107, 1114; accord, *People v. Hernandez* (2004) 33 Cal.4th 1040, 1050.)

31.

Summarized, section 190.1 "require[s] the truth of a prior murder conviction special circumstance be tried only after the guilt determination, but other special circumstances, including a gang special circumstance …, be determined at the same time as the guilt determination." (*People v. Hernandez*, *supra*, 33 Cal.4th at p. 1049; accord, *People v. Sivongxxay* (2017) 3 Cal.5th 151, 171.) The limited exception for allegations of a prior murder conviction "is intended for the benefit of capital defendants." (*People v. Farnam* (2002) 28 Cal.4th 107, 146.) "In essence, the statute recognizes that evidence of such a conviction may potentially have an inflammatory effect on jurors who are asked to determine a defendant's guilt or innocence on a current charge of murder." (*Ibid*.)

It could be argued the phrase, "A case in which the death penalty may be imposed" means bifurcation is authorized without limitation where, as here, the prosecution elects not to seek the death penalty and the defendant's maximum exposure is LWOP. (§ 190.1, subd. (a).) But this interpretation is difficult to reconcile with other parts of the statutory scheme. Section 190.2 requires special circumstance allegations to be found true "under Section 190.4." (§ 190.2, subds. (a), (c).) Section 190.4 provides, in relevant part:

> "Whenever special circumstances as enumerated in Section 190.2 are alleged and the trier of fact finds the defendant guilty of first degree murder, the trier of fact shall also make a special finding on the truth of each alleged special circumstance. The determination of the truth of any or all of the special circumstances shall be made by the trier of fact on the evidence presented at the trial or at the hearing held pursuant to Subdivision (b) of Section 190.1." (§ 190.4, subd. (a).)

As stated in *People v. Fierro* (1991) 1 Cal.4th 173, "The statutory scheme plainly contemplates that, except where the special circumstance alleged is that of a prior murder, the same jury which determines guilt shall also *at the same time* determine the truth of the special circumstance allegation." (*Id*. at p. 229, italics added.) The only judicially recognized exception we have found appears in *People v. Bigelow* (1984) 37 Cal.3d 731 (*Bigelow*), which the *Fierro* court summarized as follows:

32.

"In that case, one of the special circumstance allegations was murder for the purpose of avoiding arrest or perfecting an escape. (§ 190.2, subd. (a)(5).) At the guilt phase the prosecution presented evidence highly prejudicial to the defendant, indicating that he had committed a dozen uncharged burglaries, robberies and thefts; the prosecution's primary theory of relevance was that the defendant committed each of the crimes to finance and perpetuate an escape from custody, which was relevant to the special circumstance allegation. Because of the 'highly prejudicial' nature of the prior-crimes evidence, we concluded that the trial court should have conducted a separate trial of the special circumstance allegation." (*Fierro*, at p. 229.)

The *Fierro* appellant had moved to bifurcate a special circumstance allegation of murder committed during the perpetration of a robbery. (*People v. Fierro*, *supra*, 1 Cal.4th at pp. 200, 228.) The California Supreme Court held the trial court's denial of the motion "was correct," explaining (1) such bifurcation is not contemplated by the statutory scheme and (2) the *Bigelow* case was distinguishable. (*Fierro*, at p. 229.) The *Bigelow* exception, which allows for a "separate trial," applies where "highly prejudicial" evidence is "relevant only to a special circumstance" or so marginally relevant to the murder charge as to otherwise be inadmissible under Evidence Code section 1101, subdivision (b). (*Bigelow*, *supra*, 37 Cal.3d at pp. 747–748.)

Our research discloses no published case holding bifurcation of a special circumstance murder allegation is permissible other than as provided in section 190.1 et seq. The very few unpublished decisions addressing this issue have reached different conclusions. Either way, as now explained, we are unable to conclude section 1109 applies to gang murder allegations under section 190.2(a)(22).

Statutory interpretation is a matter of de novo review. (*People v. Lewis* (2021) 11 Cal.5th 952, 961.) "Our fundamental task … is to determine the Legislature's intent so as to effectuate the law's purpose. We first examine the statutory language, giving it a plain and commonsense meaning. We do not examine that language in isolation, but in the context of the statutory framework as a whole in order to determine its scope and purpose and to harmonize the various parts of the enactment. If the language is clear, courts must

33.

generally follow its plain meaning unless a literal interpretation would result in absurd consequences the Legislature did not intend." (*Coalition of Concerned Communities, Inc. v. City of Los Angeles* (2004) 34 Cal.4th 733, 737.)

Defendants contend section 1109's silence regarding section 190.2 is a legislative oversight that must be corrected to prevent absurd results. They argue the circumstances of this case perfectly illustrate the problem. Even if section 1109 had existed when defendants were charged in Rubio's death, the special circumstance allegation of a gang murder would have effectively circumvented its provisions.

"Section 190.2, subdivision (a)(22) 'contains three basic elements: (1) the defendant must intentionally kill the victim; (2) while an active participant in a criminal street gang; (3) in order to further the activities of the gang.'" (*People v. Arce* (2020) 47 Cal.App.5th 700, 712.) The "active participant" requirement is indistinguishable from the "active participation" element of section 186.22, subdivision (a). (*Ibid.*; see *People v. Castenada* (2000) 23 Cal.4th 743, 747.) The special circumstance provision expressly incorporates section 186.22, subdivision (f)'s definition of a criminal street gang, and the third element "substantially parallels the language of section 186.22, subdivision (b)(1)." (*People v. Carr* (2010) 190 Cal.App.4th 475, 488.) The phrase "activities of the criminal street gang" has been held to mean "the same activities that constitute the gang's pattern of criminal activity as described in section 186.22, subdivision (e)." (*Arce*, at p. 713.)

We agree with defendants insofar as section 1109 creates a potential for mischief. Prosecutors may now be incentivized to plead section 190.2(a)(22) allegations in purportedly gang-related homicide cases to introduce evidence that might otherwise be excluded because of section 1109. A gang murder allegation could also be used to leverage the type of one-sided plea bargains Assembly Bill 333 was intended to mitigate and prevent. (See Stats. 2021, ch. 699, § 2, subd. (e) ["The mere specter of gang enhancements pressures defendants to accept unfavorable plea deals rather than risk a trial filled with prejudicial evidence and a substantially longer sentence"].)

34.

To reiterate, "judicial construction of unambiguous statutes is appropriate only when literal interpretation would yield absurd results." (*Simmons v. Ghaderi* (2008) 44 Cal.4th 570, 583.) The dilemma here is that absurd results are not attributable to a literal interpretation of any part of section 1109. (Cf. *In re Mohammad* (2022) 12 Cal.5th 518, 531 ["language that seems plain when considered in isolation may be ambiguous when examined within the context of the scheme it implements"].) The statute provides for bifurcation of gang enhancement allegations "charged under subdivision (b) or (d) of Section 186.22," and mandates that "[i]f a defendant is charged with a violation of subdivision (a) of Section 186.22, this count shall be tried separately from all other counts that do not otherwise require gang evidence as an element of the crime." (§ 1109, subds. (a), (b).)

Defendants are asking us to rewrite section 1109 to expand the scope of its application, which would also require us to judicially amend multiple parts of a different statutory scheme, i.e., section 190.1 et seq. "Doing so would violate the cardinal rule that courts may not add provisions to a statute." (*Adoption of Kelsey S.* (1992) 1 Cal.4th 816, 827; accord, *People v. Guzman* (2005) 35 Cal.4th 577, 587.) "When construing a statute, our job is 'simply to ascertain and declare what is in terms or in substance contained therein, not to insert what has been omitted, or to omit what has been inserted.'" (*People v. Bell* (2015) 241 Cal.App.4th 315, 321, quoting Code Civ. Proc., § 1858.)

"'The Legislature is presumed to know the existing law and have in mind its previous enactments when legislating on a particular subject.'" (*Unzueta v. Ocean View School Dist.* (1992) 6 Cal.App.4th 1689, 1697; accord, *People v. Overstreet* (1986) 42 Cal.3d 891, 897.) The following statement appears in the legislative history of Assembly Bill 333: "Existing law: [¶] … [¶] Provides for a bifurcated trial process in determining guilt separately from punishment in cases where the death penalty may be imposed. (Pen. Code, Section 190.1.)" (Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Assem. Bill 333, as amended July 13, 2021, pp. 1, 4; accord, Assem. Com. on

35.

Public Safety, Rep. on Assem. Bill No. 333 (2021–2022 Reg. Sess.) as amended Mar. 30, 2021, pp. 2, 3.) This shows the Legislature was cognizant of the statutory procedures governing special circumstance murder allegations. We can only guess why there is no other mention of those procedures generally, or section 190.2(a)(22) specifically, in section 1109, or Assembly Bill 333, or elsewhere in the legislative history materials.

Furthermore, the potential to circumvent section 1109 by alleging a gang murder under section 190.2(a)(22) is not the only loophole in Assembly Bill 333. Also missing from section 1109 is any mention of the offense proscribed by section 182.5. "Proposition 21, the Gang Violence and Juvenile Crime Prevention Act of 1998, … created a new crime of gang conspiracy, which punishes 'any person who actively participates in any criminal street gang … with knowledge that its members engage in or have engaged in a pattern of criminal gang activity … and who willfully promotes, furthers, assists, or benefits from any felonious criminal conduct by members of that gang.'" (*People v. Lopez*, *supra*, 12 Cal.5th at p. 969, quoting § 182.5.) A determined prosecutor might even charge a traditional conspiracy (§ 182, subd. (a)(1)) based on an alleged agreement to violate section 186.22, subdivision (a), which has already happened and withstood appellate review. (See *People v. Johnson* (2013) 57 Cal.4th 250, 255, 259–265.) Another example, which Juan notes in his briefing, is section 1109's silence regarding the gang-related vicarious liability provision of section 12022.53. (See fn. 9, *ante*.)

Expanding the reach of section 1109 under the pretext of statutory construction would only invite more requests to amend the statute in future appeals. "'Each time the judiciary utilizes the "absurd result" rule, a little piece is stripped from the written rule of law and confidence in legislative enactments is lessened.…' [Citation.] Unlike a court's notion of absurdity and the revisions it would impose as a result, the text of the statute 'has successfully braved the legislative gauntlet.…' [Citation]." (*People v. Bell*, *supra*, 241 Cal.App.4th at pp. 351–352.) Thus, "even when a legislature likely would have

enacted a differently worded law had it foreseen future developments, any statutory revision reflecting that reality must come from that legislature, not the judiciary." (*Id.* at p. 344; accord, *People v. White* (2017) 2 Cal.5th 349, 371 (dis. opn. of Liu, J.) ["It is not our role to rewrite statutes, especially criminal statutes, to conform to the court's sensibilities"].) Therefore, we hold that section 1109, as originally enacted by Assembly Bill 333, does not apply to the determination of special circumstance allegations under section 190.2(a)(22).

### E.    Prejudice[*]

#### 1.    Additional Background

The People's gang expert testified Varrio Bakers is a "southern Hispanic gang," meaning a criminal street gang aligned "with the Southern California prison gang known as the Mexican Mafia." The gang's primary activities include "assaults with a deadly weapon, illegal weapons possessions, and robberies," as well as "homicides" and "narcotics sales." Its primary rivals include the Oakie Bakers and the Colonia Bakers. The expert was not aware of any rivalry between Varrio Bakers and Varrio Chico Lamont, i.e., the gang with which Rubio was allegedly associated.[11]

The predicate offenses evidence showed that two Varrio Bakers members not involved in this case had committed assault with a deadly weapon and unlawful possession of a firearm by a felon in 2015 and 2013, respectively. A third predicate offense was unnecessary, but the People also introduced evidence of Juan's commission

---

[*]See footnote, *ante*, page 1.

[11]The expert opined Rubio was an "associate" of Lamont 13, which has two "subsets": Lamont Familia Sureños and Varrio Chico Lamont. The evidence suggested Rubio had closer ties to the latter. According to the expert, there is a difference between gang members and gang associates. An associate is "a hang-around. It's someone that hangs out with maybe one of the gang members but has not put in work, doesn't have tattoos, similar stuff to that." The phrase "putting in work" was elsewhere defined as committing crimes for a gang or engaging in other activities to promote or assist the gang.

of robbery in 2013. Further evidence of Juan's criminal history was admitted to show he was a gang member.

The jury learned Juan was arrested in 2012, at age 16, for being out after curfew and possessing spray paint in violation of local ordinances. He was on probation at the time, which explained a related search of his home and the discovery of gang-related writing and imagery in the bedroom he shared with Jose. The police reportedly asked him about Varrio Bakers, and Juan said he "backs them up and … puts in work for them."

Another police witness discussed a 2015 investigation regarding Juan's involvement in an assault with a deadly weapon. This testimony also mentioned Juan's gang-related tattoos. The jury saw multiple photographs of the tattoos, which included the letters "VB" on the back of his head. Among at least six additional tattoos was one of the letters "OBK," meaning "Oakie Baker Killer."

Multiple witnesses testified about Juan's Facebook account. The content included an image of "two bats crossed with a ski mask in front of it" and the words "Goon Squad," which the expert testified was significant because Varrio Bakers members call themselves goons. Juan had a tattoo that said Goon Squad. The jury also saw Facebook photos of Juan posing with Jasso and other individuals, forming gang signs with their hands and fingers.

The gang evidence concerning Jasso included Facebook material. Jasso's account identified his employer as "Goon" and his job title as "Varrio boy." His e-mail address contained the words "varriobakers" and the number 13. In one inflammatory exchange of messages with another Facebook user, Jasso had written, "I'm still gunning down niggas that throw up the ce-be," referring to the rival Colonia Bakers gang. The jury was repeatedly shown photos of Jasso's gang-related tattoos on his neck, back, arms, and wrist.

As for Jose, a police officer testified to detaining him in 2011, at age 14, for committing gang-related vandalism. Jose had reportedly denied being a gang member, but the officer concluded he was a Varrio Bakers associate. The People's expert later misstated this testimony, claiming to have relied on Jose "admit[ing] to his membership with the gang" in forming his opinions. Although Jose denied gang membership when arrested for Rubio's death, his girlfriend arguably gave a contradictory response when police asked her, "How long has he represented Varrio Bakers?" The jury saw photos of Jose's allegedly gang-related tattoos (he had fewer than Juan or Jasso), and it learned Jose had previously been arrested and charged with possessing an illegal sawed-off shotgun.

In response to hypothetical questions, the gang expert opined the shooting was committed for the benefit of, or in association with, the Varrio Bakers gang. His explanation included this testimony: "[I]n gangs there is what is known as hyperviolence, that they go above and beyond what people could think would happen. Such as if a gang member feels disrespected over being asked to leave a store or leave a party, instead of a normal person leaving or possibly being in a fistfight, a gang member can come back and use a firearm or a knife. [¶] That is what is considered as hyperviolence. They go above and beyond. When it's regarding the graffiti, … or the victim is challenging the Varrio Bakers gang member regarding the tagging so that member of the Varrio Bakers now has to assist in that hyperviolence by now calling additional subjects over and then committing the primary activity of the murder."

### 2. Analysis

Defendants' right to bifurcation under section 1109 is purely statutory. (Cf. *People v. Hinton* (2006) 37 Cal.4th 839, 874 [describing right to a separate proceeding under § 190.1 as "merely statutory, not constitutional"].) "'Typically, a defendant who has established error under state law must demonstrate there is a reasonable probability

39.

that in the absence of the error he or she would have obtained a more favorable result.'" (*People v. Anzalone*, *supra*, 56 Cal.4th at p. 554; accord, *People v. Lewis*, *supra*, 11 Cal.5th at p. 973 ["Typically, when an 'error is purely one of state law, the [*People v. Watson* (1956) 46 Cal.2d 818] harmless error test applies'"].) "[T]he admission of evidence, even if erroneous under state law, results in a due process violation only if it makes the trial *fundamentally unfair*." (*People v. Partida* (2005) 37 Cal.4th 428, 439.)

We reject defendants' fundamental unfairness claims, especially because the gang evidence was admissible to prove the gang-murder special-circumstance allegation. (Cf. *People v. Hartsch* (2010) 49 Cal.4th 472, 492–494 [denial of severance motion not fundamentally unfair where evidence was "cross-admissible as to identity, intent, and plan"].) "*Erroneous* admission of gang-related evidence, particularly regarding criminal activities, has frequently been found to be reversible error, because of its inflammatory nature and tendency to imply criminal disposition, or actual culpability." (*People v. Bojorquez* (2002) 104 Cal.App.4th 335, 345, italics added.) Section 1109 does not bar the admission of gang evidence, and "it is likely some, though not all, of the evidence" would have been admitted to prove the murder charges. (*People v. Ramos*, *supra*, 77 Cal.App.5th at p. 1132; see Evid. Code, §§ 352, 1101, subds. (b), (c).)

Nevertheless, if section 1109 applied to gang murder allegations under section 190.2(a)(22), defendants would have a good argument even under the standard of *People v. Watson*, *supra*, 46 Cal.2d 818 (*Watson*). As noted, the jury deliberated for approximately 14 hours over a three-day period. Deliberations of such length indicate close issues. (See *People v. Cardenas* (1982) 31 Cal.3d 897, 907 [12 hours of deliberations in an attempted murder trial described as "a graphic demonstration of the closeness of this case"]; accord, *In re Martin* (1987) 44 Cal.3d 1, 51 [citing additional examples].) Even the trial court, in denying Jasso's motion for acquittal under section 1118.1, opined, "This is a close call. This is by no means a case where the evidence is overwhelming to convict Mr. Jasso on any of these charges. It is a close call."

The evidence of Jose's mental state was circumstantial. It appeared he intended for Juan to intervene in the dispute with Rubio, and the group may have gone out looking for Rubio, but this did not mean Jose intended for Juan to kill Rubio or was guilty of lying in wait. The jury may have wrestled with the question Jose raised during his custodial interview: What sense did it make to kill Rubio directly in front of Jose's house? The expert's "hyperviolence" testimony may have swayed some jurors on this issue. Jurors may have drawn other inferences about Jose's mental state from prejudicial evidence concerning Juan and Jasso. The prosecutor argued: "This just reeks of a gang-related murder. Just the fact that Jose called up gang members to come help deal with his problem is enough to establish this allegation."

Finally, although the evidence indicated Juan was the shooter, it did not necessarily compel the most consequential findings on his mental state. The California Supreme Court has "recognized that admission of evidence of a criminal defendant's gang membership creates a risk the jury will improperly infer the defendant has a criminal disposition and is therefore guilty" as charged. (*People v. Williams* (1997) 16 Cal.4th 153, 193.) However, as defendants generally concede, the gang evidence would have still come in because of the section 190.2(a)(22) gang murder allegation. Therefore, prejudice is not established. (See *People v. Hernandez*, *supra*, 33 Cal.4th at pp. 1049–1050 ["To the extent the evidence supporting the gang enhancement would be admissible at a trial of guilt, any inference of prejudice would be dispelled"]; *People v. Osband* (1996) 13 Cal.4th 622, 667 [if evidence is cross-admissible, prejudice is dispelled].)

## III.   Erroneously Admitted Evidence[*]

Jose claims the trial court erred by admitting evidence of his prior possession of an illegal firearm. The People argue the ruling was valid or, alternatively, nonprejudicial.

---

[*]See footnote, *ante*, page 1.

We agree with the harmless error argument. Assuming Jose is correct on the question of error, the claim fails for lack of prejudice.

###### A.      Background

Jose was previously convicted of possessing a short-barreled rifle or short-barreled shotgun in violation of section 33215. The underlying arrest occurred in June 2016. He accepted a plea bargain and received probation in September of the same year.

While being interrogated in this case in August 2017, Jose was asked, "What was wrong with having a shotgun?" In his response, Jose discussed how a "cop" had once stopped him while he was carrying "a little shotgun." The detective asked if it was "an illegal shotgun," and Jose said, "[W]ell it's not an illegal shotgun. It was in a backpack."

A subsequent exchange clarified the item was a "sawed off shotgun," which Jose claimed to have found in an alley. According to his story, he had been out drinking with friends and needed to "'use the restroom.'" The car in which he was traveling pulled over, Jose stepped into the alley to relieve himself, and he found the gun. He took possession of the weapon, brought it into his friend's car, and was apparently arrested for it during a subsequent traffic stop.

Jose's attorney objected to the shotgun discussion being included in the recording and transcript of his interrogation. Counsel said, "My objections are based on Evidence Code 1101(A), inadmissible character evidence, propensity, also Evidence Code 352, that is, the probative value of this is outweighed by the prejudicial effect. [¶] I think that it has minimal relevance to any of the issues in this case, if any relevance.… [W]e've had [an Evidence Code section] 402 hearing with [the People's gang expert] and there's been no mention of this."

The prosecutor argued the gang expert might rely upon the evidence "to help formulate his opinion that Mr. Jose Montano is a gang member." The prosecutor added, "I expect him to say the possession of illegal weapons is a primary activity." The trial

court ruled: "I'm allowing it. I have thought about 352. I don't believe it's more prejudicial than probative. It's simply the defendant talking about it and he chose to talk about it."

The transcript of the redacted recording of Jose's interrogation was 149 pages in length. The segment in dispute spans two pages. The recording was played in court on the third day of the prosecution's case-in-chief, which was two weeks prior to closing arguments and juror deliberations. The only other mention of the shotgun in front of jurors was by Jose's attorney during a cross-examination. The relevant exchange was as follows:

> "[DEFENSE COUNSEL:] Q. With regard to the interview, I just want to do this real quick. You spoke with Jose, you and Detective Kimball actually spoke with Jose about a shotgun possession; right?
>
> "[WITNESS:] A. Yes, there was talk about that. [¶] … [¶]
>
> "Q. You would agree with me that this discussion about this shotgun possession is unrelated to what we're here for today?
>
> "A. Yes.
>
> "Q. It's not any evidence in this case; correct?
>
> "A. No.
>
> "Q. That is correct?
>
> "A. That's correct."

## B. Standard of Review

"We review the trial court's rulings on relevance and the admission of evidence under Evidence Code sections 352 and 1101 for abuse of discretion." (*People v. Battle* (2021) 11 Cal.5th 749, 799.) Jose argues the test for prejudice is the one described in *Chapman v. California* (1967) 386 U.S. 18. "But the admission of evidence, even if erroneous under state law, results in a due process violation only if it makes the trial *fundamentally unfair*. [Citations.] Absent fundamental unfairness, state law error in

43.

admitting evidence is subject to the traditional *Watson* test: The reviewing court must ask whether it is reasonably probable the verdict would have been more favorable to the defendant absent the error." (*People v. Partida*, *supra*, 37 Cal.4th at p. 439.)

"A person seeking to overturn a conviction on due process grounds bears a heavy burden to show the procedures used at trial were not simply violations of some rule, but are fundamentally unfair." (*People v. Esayian* (2003) 112 Cal.App.4th 1031, 1042.) It is "rare and unusual" for the erroneous admission of evidence to violate a defendant's constitutional due process rights. (*People v. Albarran* (2007) 149 Cal.App.4th 214, 232; see *id*. at pp. 229–230 ["'The dispositive issue is … whether the trial court committed an error which rendered the trial "so 'arbitrary and fundamentally unfair' that it violated federal due process"'"].) We perceive no fundamental unfairness based on the ruling at issue and thus evaluate Jose's claim under the *Watson* standard.

C.    **Law and Analysis**

"Evidence Code section 1101, subdivision (a), generally prohibits 'evidence of a person's character or a trait of his or her character' when it is 'offered to prove his or her conduct on a specified occasion.' Subdivision (b) of section 1101, however, provides: 'Nothing in this section prohibits the admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident …) other than his or her disposition to commit such an act.'" (*People v. Kelly* (2007) 42 Cal.4th 763, 782–783.)

The California Supreme Court has explained "that '[t]he admissibility of other crimes evidence depends on (1) the materiality of the facts sought to be proved, (2) the tendency of the uncharged crimes to prove those facts, and (3) the existence of any rule or policy requiring exclusion of the evidence.' [Citation.] The main policy that may require exclusion of the evidence is the familiar one stated in Evidence Code section 352:

44.

Evidence may be excluded if its prejudicial effect substantially outweighs its probative value. Because substantial prejudice is inherent in the case of uncharged offenses, such evidence is admissible only if it has substantial probative value." (*People v. Kelly*, *supra*, 42 Cal.4th at p. 783.)

Jose argues the shotgun arrest did not have substantial probative value as to his alleged involvement with a criminal street gang. First, his trial counsel had accurately noted the gang expert's testimony during an evidentiary hearing conducted two weeks earlier. The expert did not rely on Jose's prior arrest or conviction to support any opinions regarding his gang ties. Second, the prosecutor did not substantiate his remarks about "possession of illegal weapons" being a primary activity of the Varrio Bakers gang.

Neither the current nor former versions of section 186.22 specifically identify possession of illegal weapons as a primary activity or predicate offense indicative of the existence of a criminal street gang. At the preliminary hearing, the People's gang expert testified the primary activities of Varrio Bakers include "murder, assault with a deadly weapon, weapons possessions, and robberies." When asked to clarify whether "weapons possessions" included "illegal weapons possession," the expert replied, "Yes. Like felon in possession of a firearm." The response alluded to section 186.22, former subdivision (e)(31).

There was no evidence Jose's violation of section 33215 also satisfied the elements of section 29800, i.e., possession of a firearm by a convicted felon. The record on appeal indicates Jose had no prior felony convictions when he was arrested for possessing the sawed-off shotgun. In the respondent's brief, the People now argue "[i]llegal weapons possession is listed in section 186.22, subdivision (e)(23), as in effect at the time of Jose's trial." However, the cited provision concerned violations of section 29610. (§ 186.22, former subd. (e)(23).) Section 29610 prohibits the possession of certain firearms by minors, i.e., persons under the age of 18. The record shows Jose was 20 years old when he was arrested for possessing the sawed-off shotgun.

In any event, the asserted error was clearly harmless. The evidence Jose had previously been arrested and "charged with possession" of a "sawed[-]off shotgun" was a miniscule part of the People's case. The prosecutor never mentioned it to the jury, nor did any witnesses except for testimony elicited by *defense counsel*, and the evidence had no implied or apparent connection to any theories of liability. It is not reasonably probable the jury's verdicts would have been different had the evidence been excluded. (Cf. *People v. Penunuri* (2018) 5 Cal.5th 126, 166 [erroneously admitted testimony held harmless where the witnesses' statements were "brief" and "a small part of the prosecution's case"]; *People v. Sully* (1991) 53 Cal.3d 1195, 1242 [allegedly improper penalty phase evidence "represented but a small portion of the information received by the jury regarding the offenses [and] the prosecutor made no attempt to exploit its presence in the record during final argument or otherwise"]; *People v. Humiston* (1993) 20 Cal.App.4th 460, 477 [in murder case, allowing evidence of defendant's "use of the Penal Code section for murder as an identifying code" in pager communications held to be harmless error].)

## IV.  Jury Instructions[*]

### A.  Failure to Instruct on Heat of Passion Manslaughter

The jury received verdict forms for voluntary manslaughter and was instructed on provocation with CALCRIM No. 522, but it was not instructed on provocation/heat of passion pursuant to CALCRIM No. 570. Jose claims the trial court had a sua sponte duty to give the latter instruction. He relies on the concept of fear-based provocation. (See *People v. Fenenbock* (1996) 46 Cal.App.4th 1688, 1704 ["The provocation may be anything which arouses great fear, anger or jealousy"].)

Jasso joins in the claim, arguing that "[b]y going to Jose's aid, [he] reasonably shared the feelings of fear and anger Jose was experiencing [toward Rubio]." Juan also

_____

[*]See footnote, *ante*, page 1.

joins in the claim, alleging "the circumstantial evidence supporting instruction on perfect and imperfect defense of self and others consisted of evidence of provocation which could support an inference that Juan killed Rubio while acting under heat of passion …." We conclude the alleged error was harmless under any standard of prejudice.

"Murder involves the unlawful killing of a human being with malice aforethought, but a defendant who intentionally commits an unlawful killing without malice is guilty only of voluntary manslaughter. [Citation.] For purposes of voluntary manslaughter, an intentional unlawful killing can lack malice when the defendant acted under a ""'sudden quarrel or heat of passion'"" …." (*People v. Blacksher* (2011) 52 Cal.4th 769, 832.) "The '"heat of passion must be such a passion as would naturally be aroused in the mind of an ordinarily reasonable person under the given facts and circumstances …."' [Citation.]" (*People v. Avila* (2009) 46 Cal.4th 680, 705.) "'The provocation which incites the defendant to homicidal conduct in the heat of passion must be caused by the victim [citation], or be conduct reasonably believed by the defendant to have been engaged in by the victim.'" (*Ibid.*)

None of the defendants argued provocation or heat of passion in their respective theories of the case. Jasso's counsel requested there be no instructions on lesser included offenses because they conflicted with his defense of mere presence. Jasso testified to complete ignorance of Jose's dispute with Rubio and claimed to have not even realized Juan shot Rubio ("[T]o my understanding, [Rubio] was the one that was shooting at us"). Thus, as to Jasso, the claim of error likely fails on the merits. (See *People v. Chestra* (2017) 9 Cal.App.5th 1116, 1122 ["the duty to instruct on inconsistent defenses does not extend to cases such as this where the sworn testimony of the accused … completely obviates any basis for finding a lesser included offense"].)

In *People v. Cruz* (2008) 44 Cal.4th 636, it was held that a jury's lying-in-wait findings negated "any possibility that defendant was prejudiced from the failure to instruct on provocation/heat of passion or unreasonable self-defense theories of

47.

manslaughter." (*Id*. at p. 665.) Jose attempts to distinguish *Cruz* by the fact that case also involved an additional special circumstance finding. (*Id.* at p. 643.) We perceive no material distinction.

Jose concedes that "several" cases are in accord with *Cruz*, including *People v. Wright* (2015) 242 Cal.App.4th 1461. His attempt to distinguish *Wright* is based on a misreading of the opinion. Jose contends *Wright* "did not involve a failure to instruct on heat of passion manslaughter, but a failure to instruct, or misinstruction, on second degree murder." In fact, the issue in *Wright* was the trial court's refusal to instruct pursuant to "CALCRIM Nos. 505 (justifiable homicide and self-defense), 570 (voluntary manslaughter—provocation and heat of passion), 571 (voluntary manslaughter—imperfect self-defense), and 522 (provocation may reduce first degree murder to second degree murder)." (*Wright*, at p. 1480.) Following an analysis of how heat of passion can develop "over a 'provocatory' period as opposed to sudden and heightened instigative situations" (*id*. at p. 1486), the appellate panel concluded "it was error for the court to refuse to give requested manslaughter instructions premised on heat of passion/provocation" (*id*. at p. 1494). The opinion goes on to say, in a subsequent prejudice analysis, "our Supreme Court has found that a lying-in-wait special-circumstance finding renders the failure to instruct on provocation/heat of passion manslaughter harmless error." (*Id*. at p. 1498, citing *People v. Cruz*, *supra*, 44 Cal.4th at p. 665.)

Because defendants were found to have committed first degree murder by means of lying in wait, any error in failing to instruct on heat of passion manslaughter was harmless.

## B.   Special Instruction re: Self-Defense

The jury received five "special" instructions. The first of those instructions read as follows:

"A person has a right to self-defense or defense of another in response to a perceived threat only if he or she actually believes the danger is imminent—a belief that there is danger but that it is not imminent will not suffice. A mere fear that it will become imminent or that it will in the future become imminent is not enough.

"A threat is imminent when there is such a demonstration of an immediate intention to execute the threat as to induce a reasonable belief that the party threatened will lose life or suffer serious bodily injury unless he or she immediately defends himself or herself against the attack of the adversary.

"A previous threat alone, and unaccompanied by any immediate demonstration of force at the time of the encounter, will not justify or excuse an assault, because it may be that the party making the threat has relented or abandoned his or her purpose, or his or her courage may have failed; or the threat may have been only idle without any purpose to execute it. Fear of future harm—no matter how great the fear and no matter how great the likelihood of the harm—is insufficient."

Jose argues the instruction is misleading because it fails to distinguish between perfect and imperfect self-defense. Specifically, the term "reasonable belief" is alleged to wrongly imply that imperfect self-defense requires an objectively reasonable belief in the imminence of the perceived danger. Jose submits the claim may be raised on appeal despite his failure to object below. Alternatively, he alleges ineffective assistance of counsel (IAC). Jasso and Juan join in these arguments.

"A party may not argue on appeal that an instruction correct in law was too general or incomplete, and thus needed clarification, without first requesting such clarification at trial." (*People v. Hillhouse* (2002) 27 Cal.4th 469, 503.) The first paragraph of the instruction is a correct statement of law. Self-defense and defense of others both require an actual fear of imminent harm. (*People v. Butler* (2009) 46 Cal.4th 847, 868.) A fear of future harm is insufficient. (*People v. Humphrey* (1996) 13 Cal.4th 1073, 1082.)

The second paragraph of the instruction tracks certain language in *People v. Scoggins* (1869) 37 Cal. 676: "There must be such a demonstration of an immediate

49.

intention to execute the threat as to induce a reasonable belief that the party threatened will lose his life or suffer serious bodily injury unless he immediately defends himself against the attack of his adversary." (*Id*. at pp. 683–684.) The first sentence of the third paragraph is taken from *Scoggins* at page 684, with only slight alteration, and the final sentence is a near verbatim quote from *In re Christian S*. (1994) 7 Cal.4th 768 at page 783. Since no part of the instruction misstates the law, defendants' claim is forfeited.

Regarding the claim of IAC, the threshold inquiry is "whether counsel's representation fell below an objective standard of reasonableness under prevailing professional norms." (*People v. Carter* (2003) 30 Cal.4th 1166, 1211.) Reviewing courts "'must indulge a "strong presumption" that counsel's conduct falls within the wide range of reasonable professional assistance.'" (*In re Long* (2020) 10 Cal.5th 764, 773.) "An attorney may choose not to object for many reasons, and the failure to object rarely establishes ineffectiveness of counsel." (*People v. Kelly* (1992) 1 Cal.4th 495, 540.) If deficient performance is shown, the appellant must also demonstrate prejudice. "Prejudice requires 'a reasonable probability that a more favorable outcome would have resulted …, i.e., a probability sufficient to undermine confidence in the outcome.'" (*People v. Fairbank* (1997) 16 Cal.4th 1223, 1241.)

Jose focuses on the distinction between perfect and imperfect self-defense. "Imperfect self-defense, which reduces murder to voluntary manslaughter, arises when a defendant acts in the actual but *unreasonable* belief that he is in imminent danger of death or great bodily injury." (*People v. Duff* (2014) 58 Cal.4th 527, 561, italics added.) Jose argues the jury likely interpreted the special instruction to mean imperfect self-defense cannot be established unless the defendant's fear of imminent harm was reasonable. But the special instruction does not purport to explain the requirements of imperfect self-defense; it refers to the "right to self-defense or defense of another."

The jury was further instructed on self-defense pursuant to CALCRIM No. 505, and it received a separate instruction on imperfect self-defense pursuant to CALCRIM

No. 571.  Given the jury's presumed ability "to understand and correlate instructions" (*People v. Sanchez* (2001) 26 Cal.4th 834, 852), Jose's trial attorney could have reasonably concluded there was no reason to object to the special instruction—especially since Jose was not arguing perfect or imperfect self-defense.  As discussed, his defense theories were mere presence and reasonable doubt as to intent to kill.  And even if deficient performance could be shown, the jury's findings of lying in wait defeat the claims of all three defendants.  (See *People v. Cruz*, *supra*, 44 Cal.4th at p. 665 [special circumstance findings, including lying in wait, "negate[d] any possibility that defendant was prejudiced from the failure to instruct on provocation/heat of passion *or unreasonable self-defense* theories of manslaughter" (italics added)].)

## C.     CALCRIM No. 1403

The following version of CALCRIM No. 1403, which is a limiting instruction, was given to the jury without objection:

> "You may consider evidence of gang activity only for the limited purpose of deciding whether:

> "•      The defendant acted with the intent, purpose, and knowledge that are required to prove the gang-related crime, enhancements, and special circumstances allegations charged;

"OR

> "•      The defendant had a motive to commit the crime charged;

"OR

> "•      The defendant actually believed in the need to defend himself.

> "You may not consider this evidence for any other purpose.  You may not conclude from this evidence that the defendant is a person of bad character or that he has a disposition to commit crime."

Jasso claims CALCRIM No. 1403 is unlawful to the extent it allows consideration of gang evidence to determine whether a defendant actually believed in the need to

defend himself. He alleges this effectively tells jurors that "gang members are subject to a different standard for self-defense." Jasso submits the alleged error affects his substantial rights and, therefore, the claim is not forfeited. He alternatively claims IAC based on his trial counsel's failure to object. Jose summarily joins in these arguments. Juan joins in the claim and makes additional arguments.

In *People v. Kaihea* (2021) 70 Cal.App.5th 257 (*Kaihea*), the Third Appellate District held the disputed portion of CALCRIM No. 1403 is "correct in law." (*Id*. at p. 265.) The opinion discusses how a challenge to the "motive" language of the instruction was rejected in *People v. Samaniego* (2009) 172 Cal.App.4th 1148, which says "[g]ang evidence is relevant and admissible when the very reason for the underlying crime, that is the motive, is gang related." (*Id*. at p. 1167.) The *Kaihea* court "further note[d] that motive, self-defense, and heat of passion are similar in that they all relate to the reason why a defendant engaged in the alleged conduct." (*Kaihea*, at p. 265.)

The *Kaihea* appellant and his codefendant were Tongan Crips gang members who had fought with two Norteño gang members. "[A] state of war existed between the two gangs at the time." (*Kaihea*, *supra*, 70 Cal.App.5th at p. 262.) As in this case, the altercation was captured on video. (*Id*. at p. 261.) At some point during the fight, one of the Norteños stabbed the codefendant multiple times in the chest. The appellant shot at both Norteños, killing one of them, but the bullets entered the decedent's body from behind and there was evidence he was killed while trying to run away. (*Id*. at p. 261.)

The *Kaihea* appellant claimed self-defense and defense of others. (*Kaihea*, *supra*, 70 Cal.App.5th at p. 263.) So "the question was why did [he] shoot [the decedent]—was it because he was motivated to kill a warring gang rival, was it because he believed in the need to defend himself or others, or was it because of a sudden quarrel/heat of passion?" (*Id.* at p. 265.) The appellate court said "[t]he interrelationship of these reasons for engaging in homicidal conduct has long since been recognized; evidence of motive is relevant to refute a claim of self-defense or sudden quarrel/heat of passion." (*Ibid*.)

52.

The *Kaihea* appellant's gang activity "logically informed a determination of whether he was motivated to kill a gang rival because of the war between his gang and the Norteños. Moreover, [he] had a personal gang-related motive—his brother was killed by Norteños in the first skirmish in the ongoing war between the two gangs. CALCRIM No. 1403, as given, was thus, correct in law as it informed the jury it could consider gang evidence for the limited purpose of establishing whether defendant actually believed in the need to defend himself." (*Kaihea*, *supra*, 70 Cal.App.5th at p. 266.)

Here, there was evidence the dispute between Jose and Rubio arose over gang graffiti on a house formerly occupied by Rubio's grandmother. The gang expert testified, "When it's regarding the graffiti, it's showing that a—or the victim is challenging the Varrio Bakers gang member [Jose] regarding the tagging so that member of the Varrio Bakers now has to assist in that hyperviolence by now calling additional subjects over and then committing the primary activity of the murder." For the jury to evaluate Juan's various defenses, it had to determine whether he shot Rubio because Rubio pulled out a gun, or because Rubio had threatened to harm his brother, or because Rubio had disrespected the Varrio Bakers, or a combination of those things. Therefore, based on the holding of *Kaihea*, defendants' claim of instructional error fails on the merits.

The *Kaihea* opinion further holds "that gang evidence is relevant to defense of others." (*Kaihea*, *supra*, 70 Cal.App.5th at p. 265.) Therefore, CALCRIM No. 1403 may be modified upon request to allow consideration of gang evidence "for the limited purpose of deciding whether the defendant actually believed in the need to defend himself *or someone else*." (*Kaihea*, at p. 267.) This holding is relevant to a specific argument made by Juan.

In his briefing, Juan complains the instruction used at trial "did not permit evidence of Rubio's gang association to decide whether Juan actually believed he needed to defend Jose," which allegedly "undermined Juan's defense." The assertions are made in support of his argument that CALCRIM No. 1403 is unlawful. However, because the

53.

instruction is legally correct, it was "incumbent [upon him] to request clarifying language, and his failure to do so forfeits the issue." (*Kaihea*, *supra*, 70 Cal.App.5th at p. 265.) Although Juan summarily joins in Jasso's claim of IAC, neither Jasso nor Juan have argued their trial lawyers should have requested clarifying language.

Insofar as Juan might now allege IAC based on his counsel's failure to request that defense of others language be added to the instruction, prejudice is lacking. In *Kaihea*, the same IAC claim was rejected because the appellant could only have benefitted from the omission: "[S]ince the instruction limited the purpose for which the gang evidence could be used to whether [he] actually believed in the need to defend himself and told the jury it could not be used for any other purpose (other than the other three listed limited purposes), the instruction effectively barred the jury's use of the gang evidence to *negate* defense of others." (*Kaihea*, *supra*, 70 Cal.App.5th at p. 267, italics added.)

Juan's prejudice argument fails for other reasons. First, there was virtually no evidence of "gang activity" by Rubio probative of whether Juan actually believed in the need to use lethal force to defend Jose. Rubio had "Varrio Chico Lamont" etched into his cell phone, and there were photos on his Facebook account of him flashing gang signs, but there was no indication Juan had knowledge of those facts on the day of the shooting. Second, the instruction did not preclude the jury from considering the evidence of Rubio's alleged threats to shoot and kill Jose and of his alleged possession of a firearm. There is no likelihood the jury would have accepted Juan's defense of others theory, instead of returning its verdicts of premeditated murder and lying in wait, but for the wording of the CALCRIM No. 1403 instruction.

### D. CALCRIM No. 505

CALCRIM No. 505 explains justifiable homicide in terms of self-defense and defense of others. It begins by stating the required elements, which were described for jury in this way:

54.

"The defendants are not guilty of murder or manslaughter if they were justified in killing someone in self-defense or defense of another. A defendant acted in lawful self-defense or defense of another if:

"1.      The defendant reasonably believed that he or Jose Montano or Giovann[i] Jasso or Kasey Villegas was in imminent danger of being killed or suffering great bodily injury.

"2.      The defendant reasonably believed that the immediate use of deadly force was necessary to defend against that danger.

"AND

"3.      The defendant used no more force than was reasonably necessary to defend against that danger."

CALCRIM No. 505 continues with two paragraphs concerning the defendant's "beliefs." The instruction given to the jury below mirrored the pattern instruction:

"Belief in future harm is not sufficient, no matter how great or how likely the harm is believed to be. The defendant must have believed there was imminent danger of death or great bodily injury to himself or someone else. Defendant's belief must have been reasonable and he must have acted only because of that belief. The defendant is only entitled to use that amount of force that a reasonable person would believe is necessary in the same situation. If the defendant used more force than was reasonable, the killing was not justified.

"When deciding whether the defendant's beliefs were reasonable, consider all the circumstances as they were known to and appeared to the defendant and consider what a reasonable person in a similar situation with similar knowledge would have believed. If the defendant's conduct and beliefs were reasonable, the danger does not need to have actually existed."

The pattern instruction has additional, optional language. Relevant here is this bracketed sentence: "[If you find that _____ <insert name of decedent/victim> threatened or harmed the defendant [or others] in the past, you may consider that information in deciding whether the defendant's conduct and beliefs were reasonable.]"

The trial court modified the optional language to read: "If you find from the evidence that prior to the shooting, Juan Montano had received information of threats by Abraham Rubio against Juan Montano or Jose Montano then Juan Montano may be

55.

justified in acting more quickly and taking harsher measures than would a person who had not received such threats. You may consider that information in evaluating the defendant's beliefs."

The "acting more quickly and taking harsher measures" segment was likely taken from CALJIC No. 5.50.1. This language was more favorable to Juan than the bracketed option in CALCRIM No. 505, and he has no complaints about that variance. Juan claims, however, that the trial court erred by omitting the word "conduct." Whereas the pattern instruction refers to "whether the defendant's conduct and beliefs were reasonable," the modified instruction refers only to his "beliefs." Juan alleges the trial court breached a sua sponte duty to provide a complete and accurate instruction. We disagree.

"We determine the correctness of jury instructions from the entire charge of the court, not from a consideration of parts of an instruction or from a particular instruction." (*People v. Pescador* (2004) 119 Cal.App.4th 252, 257.) "When an instruction is potentially ambiguous or misleading, the instruction is not reversible error unless there is a reasonable likelihood that the jurors misunderstood or misapplied the pertinent instruction." (*People v. Iboa* (2012) 207 Cal.App.4th 111, 121.) These assessments are made with the presumption jurors are "'intelligent, capable of understanding instructions and applying them to the facts of the case.'" (*People v. Lewis* (2001) 26 Cal.4th 334, 390.) No such juror would understand the instruction to require analysis of the reasonableness of Juan's beliefs in the abstract. The instruction obviously requires the evaluation of a defendant's beliefs in relation to the conduct that may qualify as self-defense or defense of others, i.e., the act of "killing someone."

## E.    CALCRIM No. 521

Juan asserts a multipart claim regarding the version of CALCRIM No. 521 given to the jury. He correctly identifies error in the omission of statements concerning the

intent to kill.  We reject the People's argument that the claim is forfeited.[12]  However, we conclude the error was harmless beyond a reasonable doubt.

### 1.    *Background*

CALCRIM No. 521 explains several different theories of first degree murder liability.  Only parts of the instruction will be applicable in any given case.  Relevant here are the sections addressing "Deliberation and Premeditation" and "Lying in Wait."  As stated in the pattern instruction, those sections provide:

"<*A. Deliberation and Premeditation*>

"[The defendant is guilty of first degree murder if the People have proved that (he/she) acted willfully, deliberately, and with premeditation. The defendant acted *willfully* if (he/she) intended to kill.  The defendant acted *deliberately* if (he/she) carefully weighed the considerations for and against (his/her) choice and, knowing the consequences, decided to kill. The defendant *acted with premeditation* if (he/she) decided to kill before completing the act[s] that caused death.

"The length of time the person spends considering whether to kill does not alone determine whether the killing is deliberate and premeditated. The amount of time required for deliberation and premeditation may vary from person to person and according to the circumstances.  A decision to kill made rashly, impulsively, or without careful consideration is not deliberate and premeditated. On the other hand, a cold, calculated decision to kill can be reached quickly. The test is the extent of the reflection, not the length of time.]  [¶] … [¶]

"<*C. Lying in Wait*>

"[The defendant is guilty of first degree murder if the People have proved that the defendant murdered while lying-in-wait or immediately thereafter. The defendant murdered by lying in wait if:

"1.  (He/She) concealed (his/her) purpose from the person killed;

---

[12]"The trial court's duty to fully and correctly instruct the jury on the basic principles of law relevant to the issues raised by the evidence in a criminal case is so important that it cannot be nullified by defense counsel's negligent or mistaken failure to object to an erroneous instruction or the failure to request an appropriate instruction." (*People v. Avalos* (1984) 37 Cal.3d 216, 229.)

"2. (He/She) waited and watched for an opportunity to act;

"AND

"3. Then, from a position of advantage, (he/she) intended to and did make a surprise attack on the person killed.

"The lying in wait does not need to continue for any particular period of time, but its duration must be substantial enough to show a state of mind equivalent to deliberation or premeditation. [*Deliberation* means carefully weighing the considerations for and against a choice and, knowing the consequences, deciding to act. An act is done with *premeditation* if the decision to commit the act is made before the act is done.]

"[A person can conceal his or her purpose even if the person killed is aware of the person's physical presence.]

"[The concealment can be accomplished by ambush or some other secret plan.]"

Here, the trial court combined the above sections together but omitted the first paragraph of "Deliberation and Premeditation." The second paragraph of "Deliberation and Premeditation" was inserted in the middle of the "Lying in Wait" section, so the entire instruction read as follows (the out-of-place paragraph is italicized):

"A defendant is guilty of first degree murder if the People have proved that the defendant murdered while lying in wait or immediately thereafter. The defendant murdered by lying in wait if:

"1. He concealed his purpose from the person killed;

"2. He waited and watched for an opportunity to act;

"AND

"3. Then, from a position of advantage, he intended to and did make a surprise attack on the person killed.

"The lying in wait does not need to continue for any particular period of time, but its duration must be substantial enough to show a state of mind equivalent to deliberation or premeditation. *Deliberation* means carefully weighing the considerations for and against a choice and, knowing the consequences, deciding to act. An act is done with

58.

*premeditation* if the decision to commit the act is made before the act is done.

"*The length of time the person spends considering whether to kill does not alone determine whether the killing is deliberate and premeditated.  The amount of time required for deliberation and premeditation may vary from person to person and according to circumstances.  A decision to kill made rashly, impulsively, or without careful consideration is not deliberate and premeditated.  On the other hand, a cold, calculated decision to kill can be reached quickly.  The test is the extent of the reflection, not the length of time*.

"A person can conceal his or her purpose even if the person killed is aware of the persons [*sic*] physical presence.

"The concealment can be accomplished by ambush or some other secret plan."  (First italics in original, second italics added.)

The partial omission of the "Deliberation and Premeditation" section of CALCRIM No. 521 resulted in the jury not being fully instructed on willfulness, i.e., the intent to kill.  The record shows this was accidental.  Defense counsel noted the omission in the proposed instruction, the trial court stated its intention to include the language, and the correction was never made.

In a separate instruction (CALCRIM No. 520), the jury was instructed on express and implied malice.  Because the modified version of the CALCRIM No. 521 instruction did not specify an intent-to-kill requirement under the "Deliberation and Premeditation" theory, Juan argues the jury's verdict of premeditated murder might have been based on insufficient findings.

Juan further submits that including the above italicized language in the CALCRIM No. 521 instruction created a misstatement of law.  He argues:  "[I]nserting language describing the quickness with which premeditation might be formed in conjunction with the elements of a 'substantial period of watching and waiting' altered that defining distinction between an ordinary malice murder and first-degree lying-in-wait murder."  He continues, "To the extent the jury was guided to consider only first degree lying-in-

59.

wait murder (as opposed to premeditated first-degree murder), the jury did so with conflicting standards, i.e., 'substantial period of watching and waiting' equivalent to premeditation and deliberation, but premeditation defined as possibly 'reached quickly' requiring only sufficient reflection, but not a substantial length of time."

### 2. *Analysis*

Pattern instructions are not the law; they are "merely an attempt at a statement thereof." (*People v. Alvarez* (1996) 14 Cal.4th 155, 217.) Error and prejudice do not necessarily follow from the failure to perfectly recite a CALCRIM instruction, but rather from a failure to convey the legal principles necessary for jurors to render an informed verdict. The issue here boils down to whether the jury determined Juan acted with the intent to kill.

According to the verdict forms, the jury found Juan's commission of murder "was done with premeditation and deliberation within the meaning of … Section 189, as alleged in the first count of the Information." The jury asked no questions about these concepts, and it presumably relied on the modified CALCRIM No. 521 instruction. We note the following language therein: "The length of time the person spends *considering whether to kill* does not alone determine whether the killing is deliberate and premeditated. … *A decision to kill* made rashly, impulsively, or without careful consideration is not deliberate and premeditated. On the other hand, a cold, calculated *decision to kill* can be reached quickly." (Italics added.) In light of this language, Juan's suggestion the finding of premeditation and deliberation was made without the belief he intended to kill Rubio is unconvincing.

Had the jury based its verdict of first degree murder on findings that did not include the intent to kill, it would have presumably *rejected* the special circumstance allegation of lying in wait. (See *People v. Holt* (1997) 15 Cal.4th 619, 662 [jurors are

presumed to follow the trial court's instructions].)  The jury was separately instructed on the special circumstance pursuant to CALCRIM No. 728.  It stated, in relevant part:

> "The defendants are charged with the special circumstance of murder committed while lying in wait.
>
> "To prove that this special circumstance is true, the People must prove that:
>
> "1.  The defendants *intentionally killed* Abraham Rubio;
>
> "AND
>
> "2.     The defendants committed the murder by means of lying in wait.
>
> "A person commits a murder by means of lying in wait if:
>
> "1.     He or she concealed his or her purpose from the person killed;
>
> "2.     He or she waited and watched for an opportunity to act;
>
> "3.     Then he or she made a surprise attack on the person killed from a position of advantage;
>
> "AND
>
> "4.     He or she *intended to kill the person* by taking the person by surprise.
>
> "The lying in wait does not need to continue for any particular period of time, but its duration must be substantial and must show a state of mind equivalent to deliberation or premeditation.
>
> "The defendants [*sic*] acted deliberately if he carefully weighed the considerations for and against his choice and, knowing the consequences, *decided to kill*.  The defendant acted with premeditation if he *decided to kill* before committing the act that caused death."  (Italics added, original italics deleted.)

The jury's true finding on the lying-in-wait special-circumstance allegation dispels any suggestion of prejudice in the erroneous modification of CALCRIM No. 521.  It is apparent, beyond a reasonable doubt, that the jury found Juan acted with the intent to kill.

61.

Juan's secondary argument regarding the temporal distinctions between premeditation/deliberation and the "substantial" period of time required for lying in wait is unavailing. "The lying in wait need not continue for any particular period of time provided that its duration is substantial in the sense that it shows a state of mind equivalent to premeditation or deliberation." (*People v. Cage* (2015) 62 Cal.4th 256, 279; see *id.* at p. 281 ["The difference between lying-in-wait murder and the lying-in-wait special circumstance does 'not touch on th[is] durational element of lying in wait'"].) Juan also ignores that the language of which he complains is part of CALCRIM No. 521 and, because of the People's dual theories of first degree murder, would have been in the instruction regardless of the modification mistake. We reject the assertion of error. (See *People v. Moon* (2005) 37 Cal.4th 1, 23 ["Although we have held the period of watchful waiting must be 'substantial' [citation], we have never placed a fixed time limit on this requirement. Indeed, the opposite is true, for we have previously explained that '[t]he precise period of time is also not critical'"]; *People v. Battle* (2011) 198 Cal.App.4th 50, 81 ["As shown by *Moon*, 90 seconds can be a sufficient period of time to support a lying-in-wait instruction"].)

The failure of Juan's secondary claim entirely negates his prejudice argument as to the instructional error on the intent to kill. This is so because the jury was fully instructed under CALCRIM No. 521 on the lying-in-wait theory of first degree murder. "'Lying in wait is the functional equivalent of proof of premeditation, deliberation, and intent to kill.'" (*People v. Sandoval* (2015) 62 Cal.4th 394, 416.) "'Thus, a showing of lying in wait obviates the necessity of separately proving premeditation and deliberation …' [citation] *or intent to kill* [citation]." (*People v. Wright*, *supra*, 242 Cal.App.4th at p. 1496, italics added.) As such, the instructional error does not require reversal of Juan's conviction of first degree murder.

## F. CALCRIM No. 703

Jasso's trial counsel proposed a special instruction highlighting, among other things, the intent to kill requirement for aiding and abetting liability. The trial court later said CALCRIM No. 703 "does address to some extent [Jasso's counsel's] proposed language," and then stated its intention to use CALCRIM No. 703. All counsel expressed either concern or uncertainty regarding the applicability of CALCRIM No. 703, which is designed for special circumstance allegations in felony-murder cases. During this initial discussion, Juan's counsel said, "Here is the problem. 703 has nothing to do with this case. This is felony murder."

The prosecutor suggested using a very truncated version of CALCRIM No. 703 to explain the required mental state of the aiders and abettors (intent to kill). This led to further discussion among the parties and trial court, and further editing to the proposed version of the instruction. Days later, the trial court informed counsel of all the instructions it intended to use. The court specifically said, "I intend to read 640, 700, 703, 704, 705, 706, 728, 736. Any issues, objections, or concerns, other than already articulated last week, in regards to 640 and the 700s?" All counsel replied, "No."

The modified version of CALCRIM No. 703 read as follows:

> "If you decide that a defendant is guilty of first degree murder but was not the actual killer, then, when you consider the special circumstances of lying in wait within the meaning of PC Section 190.2(a)(15), you must also decide whether the defendant acted with intent to kill.

> "In order to prove these special circumstances for a defendant who is not the actual killer but who is guilty of first degree murder as an aider and abettor, the People must prove that the defendant intended to kill.

> "If the People have not met this burden, you must find these special circumstances have not been proved true for that defendant."

The jury was also instructed with CALCRIM No. 728, i.e., the pattern instruction on the special circumstance of lying in wait quoted in the preceding section of this opinion. The instruction stated, in relevant part, "the People must prove that" "[t]he

63.

defendants intentionally killed Abraham Rubio" and "[a] person commits a murder by means of lying in wait if" "[h]e or she intended to kill the person by taking the person by surprise."

Juan now claims the modified CALCRIM No. 703 instruction was potentially misleading. According to him, the instruction "logically suggested the specific intent to kill element in [CALCRIM No.] 728 applied *only* to the codefendants. Understood in this fashion, [CALCRIM No.] 703 read together with [CALCRIM No.] 728 implicitly excused jurors from finding the actual killer acted with intent to kill in order to find the lying-in-wait special circumstance true with regard to the actual killer."

The People argue this claim was forfeited, and we agree. The modified version of CALCRIM No. 703 was an entirely correct statement of law. (See § 190.2, subd. (c) ["Every person, not the actual killer, who, with the intent to kill, aids, abets, counsels, commands, induces, solicits, requests, or assists any actor in the commission of murder in the first degree shall be punished by death or [LWOP] if one or more of the special circumstances enumerated in subdivision (a) has been found to be true under Section 190.4"].) As previously noted, "[a] party may not argue on appeal that an instruction correct in law was too general or incomplete, and thus needed clarification, without first requesting such clarification at trial." (*People v. Hillhouse*, *supra*, 27 Cal.4th at p. 503; accord, *People v. Hardy* (1992) 2 Cal.4th 86, 153 ["[B]ecause the instruction given was correct, it was incumbent on defendants to request clarifying language. Their failure to do so waived the issue"].)

## V.     Cumulative Error[*]

Under the cumulative error doctrine, "a series of trial errors, though independently harmless, may in some circumstances rise by accretion to the level of reversible and prejudicial error." (*People v. Hill* (1998) 17 Cal.4th 800, 844; accord, *People v. Capers*

---

[*]See footnote, *ante*, page 1.

(2019) 7 Cal.5th 989, 1017.)  Giving due consideration to the collective impact of the errors found herein, we conclude further reversal of the judgments beyond count 2 and the gang-related enhancements is unwarranted.

## VI.    Sentencing Issues[*]

### A.    Cruel and/or Unusual Punishment

Jose was 21 years old at the time of Rubio's murder.  He claims his statutorily mandated LWOP sentence is unconstitutionally punitive "because it deprives the sentencing court of the discretion to consider an adult defendant's youth and immaturity and to impose a sentence less than LWOP."  Jasso (then age 19) and Juan (then age 22) summarily join in this claim.

As used in the Eighth Amendment to the federal Constitution, the phrase "cruel and unusual punishments" refers to "'extreme sentences that are "grossly disproportionate" to the crime.'"  (*Graham v. Florida* (2010) 560 U.S. 48, 59–60.)  The California Constitution forbids cruel or unusual punishment (Cal. Const., art. I, § 17), which precludes a sentence that is "'so disproportionate to the crime for which it is inflicted that it shocks the conscience and offends fundamental notions of human dignity.'"  (*People v. Carmony* (2005) 127 Cal.App.4th 1066, 1085, quoting *In re Lynch* (1972) 8 Cal.3d 410, 424.)  Jose relies on cases dealing with the constitutional limits of punishment for juvenile offenders, including *Miller v. Alabama* (2012) 567 U.S. 460 (*Miller*).

The *Miller* case holds it is cruel and unusual to impose a mandatory sentence of LWOP for a homicide committed prior to the defendant's 18th birthday.  Therefore, sentencing courts must be given discretion to consider the juvenile offender's age and youthful characteristics before imposing such punishment.  (*Miller*, *supra*, 567 U.S. at p. 489.)  Although defendants were not juveniles when they killed Rubio, Jose argues the

---

[*]See footnote, *ante*, page 1.

rationale of *Miller* is equally applicable to offenders who have reached the age of majority but are not yet "mature adult[s] with fully developed executive functioning." He concedes the judiciary has "drawn a bright line at the age of 18," but he asks us to take a new approach. (See, e.g., *Roper v. Simmons* (2005) 543 U.S. 551, 574 [stating "a line must be drawn," and "[t]he age of 18 is the point where society draws the line for many purposes between childhood and adulthood"]; *People v. Edwards* (2019) 34 Cal.App.5th 183, 186, 190–192, [upholding as constitutional sentences of 95 years to life and 129 years to life imposed against 19-year-old sex offenders]; *People v. Perez* (2016) 3 Cal.App.5th 612, 617 ["We decline … to conclude the bright line of 18 years old in the criminal sentencing context is unconstitutional"].) We are not persuaded to break from precedent on this issue.

The Legislature has also established a dividing line with regard to youthful offenders. Section 3051 provides an opportunity for early release to most defendants serving life terms for crimes committed prior to the age of 26. (*Id*., subd. (b)(2)–(3).) This includes defendants who are serving "de facto" LWOP sentences, i.e., life terms with decades-long periods of parole ineligibility. (See *People v. Scott* (2016) 3 Cal.App.5th 1265, 1281–1282.) Section 3051 was enacted and later amended in response to *Miller* and its progeny. (*People v. Perez*, *supra*, 3 Cal.App.5th at p. 618; see *In re Jenson* (2018) 24 Cal.App.5th 266, 277.) However, the statute does not apply to defendants who are "sentenced to life in prison without the possibility of parole for a controlling offense that was committed after the person had attained 18 years of age." (§ 3051, subd. (h).)

As stated in *People v. Martinez* (1999) 76 Cal.App.4th 489, "Fixing the penalty for crimes is the province of the Legislature, which is in the best position to evaluate the gravity of different crimes and to make judgments among different penological approaches. [Citations.] Only in the rarest of cases could a court declare that the length

66.

of a sentence mandated by the Legislature is unconstitutionally excessive. [Citations.] This is not such a case." (*Id*. at p. 494.)

## B. Equal Protection Claim

"[S]ection 3051 provides that an offender who committed a 'controlling offense' as a youth is entitled to a "youth offender parole hearing" after a fixed period of years set by statute. The 'controlling offense' is 'the offense or enhancement for which any sentencing court imposed the longest term of imprisonment.' [Citation.] [¶] As originally enacted, section 3051 applied only to non-LWOP offenses committed before the offender was 18 years old. (Stats. 2013, ch. 312, § 4.) An amendment effective January 1, 2016, raised the age of eligibility to 23 years; and an amendment effective January 1, 2018, raised the age of eligibility to 25 years and included LWOP offenses committed before age 18. [Citations]." (*In re Jenson*, *supra*, 24 Cal.App.5th at p. 277.)

"Thus, section 3051 now provides that an offender who committed a 'controlling offense' under the age of 26 is entitled to a 'youth offender parole hearing' during his or her 15th year of incarceration if he received a determinate sentence; during his or her 20th year of incarceration if he or she received a life term of less than 25 years to life; and during his or her 25th year of incarceration if he or she received a term of 25 years to life. (§ 3051, subd. (b)(1)–(3).) An offender convicted of a controlling offense committed before the age of 18 for which he or she was sentenced to LWOP is entitled to a youth offender parole hearing during his or her 25th year of incarceration. (§ 3051, subd. (b)(4).)" (*In re Jenson*, *supra*, 24 Cal.App.5th at p. 277.) However, as discussed above, the statute provides no relief for defendants "sentenced to life in prison without the possibility of parole for a controlling offense that was committed after the person had attained 18 years of age." (§ 3051, subd. (h).)

Jasso claims section 3051 violates constitutional guarantees of equal protection by treating "two similarly situated groups unequally: those aged 18 to 25 sentenced to

LWOP and those aged 18 to 25 sentenced to life terms with a minimum sentence of 25 years or more." He contends "[i]t also treats unequally those who were sentenced to LWOP when they were under the age of 18 when they committed the controlling offense and those sentenced to LWOP who were 18 to 25 when they committed the controlling offense." Jose and Juan join in these arguments.

"We review an equal protection claim de novo." (*People v. Laird* (2018) 27 Cal.App.5th 458, 469.) "The California equal protection clause offers substantially similar protection to the federal equal protection clause." (*Ibid.*) "The first step in an equal protection analysis is to determine whether the defendant is similarly situated with those who are entitled to the statutory benefit." (*People v. Cervantes* (2020) 44 Cal.App.5th 884, 888.) Defendants' claim satisfies this requirement. (*People v. Acosta* (2021) 60 Cal.App.5th 769, 779.)

"If a class of criminal defendants is similarly situated for purposes of the law challenged to another class of defendants who are treated differently, 'courts look to determine whether there is a rational basis for the difference.' [Citation.] '[E]qual protection of the law is denied only where there is no 'rational relationship between the disparity of treatment and some legitimate governmental purpose.'" (*People v. Acosta*, *supra*, 60 Cal.App.5th at p. 778.) "To successfully challenge a law on equal protection grounds, the defendant must negate ""'every conceivable basis'"" on which 'the disputed statutory disparity' might be supported. [Citation.] 'If a plausible basis exists for the disparity, "[e]qual protection analysis does not entitle the judiciary to second-guess the wisdom, fairness, or logic of the law.""" (*Ibid.*)

In *Acosta*, Division Three of the Fourth Appellate District held "there is a rational basis for treating young adult LWOP offenders differently than juvenile offenders sentenced to life or LWOP [and] young adult offenders sentenced to life." (*People v. Acosta*, *supra*, 60 Cal.App.5th at p. 779.) The same conclusion was reached by Division One of the Fourth Appellate District in *People v. Jackson* (2021) 61 Cal.App.5th 189 and

by Division Five of the Second Appellate District in *In re Williams* (2020) 57 Cal.App.5th 427.  We agree with these decisions.

The *Acosta* court determined that the expansion of section 3051 to include juvenile LWOP offenders was in response to the United States Supreme Court's decision in *Montgomery v. Louisiana* (2016) 577 U.S. 190.  (*People v. Acosta*, *supra*, 60 Cal.App.5th at p. 777.)  *Montgomery* held that *Miller*, *supra*, 567 U.S. 460 announced a substantive rule of constitutional law and, therefore, applied retroactively, but states could "remedy a *Miller* violation by permitting juvenile homicide offenders to be considered for parole, rather than by resentencing them."  (*Montgomery*, at p. 212.)  The amendment to section 3051 allowed for compliance "without resorting to costly resentencing hearings." (*Acosta*, *supra*, at p. at p. 779.)  Because *Montgomery* did not compel the same treatment of young adult offenders, age is "a constitutionally sufficient basis for distinguishing juvenile LWOP offenders from young adult LWOP offenders."  (*Acosta*, at p. 780.)  The *Jackson* court analyzed this issue differently, observing that "both the United States Supreme Court and our high court have repeatedly found the bright line drawn between juveniles and nonjuveniles to be a rational one when it comes to criminal sentencing." (*People v. Jackson*, *supra*, 61 Cal.App.5th at pp. 196–197.)

With respect to young adult offenders serving LWOP and non-LWOP sentences, the *Acosta* court reasoned that "'[t]he Legislature has prescribed an LWOP sentence for only a small number of crimes.  These are the crimes the Legislature deems so morally depraved and so injurious as to warrant a sentence that carries no hope of release for the criminal and no threat of recidivism for society.'" (*People v. Acosta*, *supra*, 60 Cal.App.5th at p. 780.)  Therefore, "the severity of the crime committed" provides a rational basis for distinguishing between the groups.  (*Ibid.*; accord, *In re Williams*, *supra*, 57 Cal.App.5th at p. 436.)

We will follow the published case law on this issue.  We also agree with the People's reliance on the following language from *Johnson v. Department of Justice*

(2015) 60 Cal.4th 871: "[T]he rational basis standard does not give courts free license to judge the wisdom or desirability of statutes or to act as a super-Legislature." (*Id.* at p. 880, fn. 5.) "'[W]hen conducting rational basis review, we must accept any gross generalizations and rough accommodations that the Legislature seems to have made.' [Citation.] 'A classification is not arbitrary or irrational simply because there is an "imperfect fit between means and ends"' [citations], or 'because it may be "to some extent both underinclusive and overinclusive"' [citations].... [¶] At bottom, the Legislature is afforded considerable latitude in defining and setting the consequences of criminal offenses." (*Id.* at p. 887.)

## C. Juan's 10-year Gang Enhancement

Juan and the People dispute whether the imposition of LWOP on the murder conviction precludes a separate gang enhancement term. Since the enhancement is being reversed and the corresponding punishment vacated, we view this claim as moot and decline to address it.

## D. Juan's Prior Prison Term Enhancements

Juan argues, and the People concede, the prior prison term enhancements must be stricken from the judgment. Effective January 1, 2020, the one-year enhancement provided for in section 667.5, subdivision (b) is inapplicable to all prior prison terms except those served for a sexually violent offense within the meaning of Welfare and Institutions Code section 6600, subdivision (b). (Stats. 2019, ch. 590, § 1.) This change in the law has been held to apply retroactively to nonfinal judgments. (*People v. Lopez* (2019) 42 Cal.App.5th 337, 341–342.)

The recent enactment of section 1171.1 confirms the Legislature's intent for retroactive relief. The new statute provides: "Any sentence enhancement that was imposed prior to January 1, 2020, pursuant to subdivision (b) of Section 667.5, except for any enhancement imposed for a prior conviction for a sexually violent offense as defined

in subdivision (b) of Section 6600 of the Welfare and Institutions Code is legally invalid." (*Id.*, subd. (a).) Juan's prior prison terms were served for robbery and unlawful participation in a criminal street gang. We therefore reverse the enhancement findings made under section 667.5 and order the corresponding punishment stricken from the judgment.

## DISPOSITION

As to all defendants, the convictions of unlawful participation in a criminal street gang in violation of section 186.22, subdivision (a), and all enhancement allegations found true under subdivision (b) of the same statute, are reversed. As to Giovanni Jasso and Jose Montano only, the firearm enhancements imposed pursuant to section 12022.53 are reversed. As to Juan Montano, the prior prison term enhancements imposed pursuant to section 667.5 are reversed. In all other respects, the judgments are affirmed. The matter is remanded for further proceedings consistent with this opinion.


                                                               PEÑA, J.

WE CONCUR:


HILL, P. J.


SMITH, J.


71.